[Crim. No. 13747. Second Dist., Div. Four. Apr. 21, 1969.]

THE PEOPLE, Plaintiff and Respondent, v. CYNTHIA CHATFIELD, Defendant and Appellant.

142

Irving D. Apple, Victor Dobrin and Frank O. Walther for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James Assistant Attorney General, and Philip C. Griffin, Deputy Attorney General, for Plaintiff and Respondent.

FILES, P. J.—Following a court trial defendant was convicted of three offenses: (1) attempted grand theft from Jackie Metcalf, (2) attempted grand theft from Concetta Jor-

gensen, and (3) grand theft from Moises Heilbron. This appeal is from the judgment.[1]

Since there is no room for doubt as to the sufficiency of the evidence, it is unnecessary to relate the facts in any detail. Disregarding conflicts in the evidence (see *People* v. *Hills* (1947) 30 Cal.2d 694, 700 [185 P.2d 11]) the following are some of the circumstances on which the judgment rests.

Defendant is a chiropractor. The criminal offenses arose out of the representations made by defendant and her associates in the Drown Laboratories concerning a type of machine used in the purported diagnosis and treatment of illness. Ruth Drown, the mother of defendant, had been charged in the same indictment, but died prior to the trial.

The device consisted of a box with an instrument panel which included an ammeter and a number of dials and the means by which various wires could be connected to the device. Metal footplates and an electrode made of lead were attached to wires which could be plugged into the box. Defendant represented that the machine could be used either for direct or indirect treatment. Direct treatment was accomplished by placing the patient's feet on the footplates and then placing the electrode on the portion of the anatomy which required treatment. The dials on the box were then adjusted to the "rates" which were appropriate to the condition being treated. A publication called the "Drown Atlas" contained tables of rates applicable to the various organs of the body and the illnesses which were treated.

There was a well in the box where a vial of some chemical substance could be placed to aid the treatment. For treatment of the common cold, a vial of hydrogen chloride was to be used. Spirits of ammonia was also said to be good for that purpose. If the desired chemical was not available in a vial small enough to fit in the well, it could be placed between the rubber covering and the metal of the footplate.

Defendant stated that each person must use his own elec-

---

[1]The abstract of judgment appearing in the clerk's transcript recites that defendant was found guilty of "attempted grand theft . . . as charged in each of the counts 1, 2 and 3 of the indictment." This cannot be reconciled with other portions of the record. The clerk's transcript and the reporter's transcript both show that the court found defendant guilty as charged in counts 1, 2 and 4 of the indictment. Count 4 was a charge of grand theft from Moises Heilbron. Count 3 was dismissed on the People's motion at the close of the evidence. Nothing in the record here indicates that the conviction for grand theft was reduced to attempt. If, as it would seem from this record, the abstract of judgment contains a clerical error, the superior court may correct it after remand. (See *People* v. *Flores* (1960) 177 Cal.App.2d 610, 613 [2 Cal.Rptr. 363].)

trode because " 'Your energy is housed in the electrode itself.' "

For indirect treatment it was not necessary for the patient to be present where the machine was located. A drop of the patient's blood was placed on a blotter, which was attached to the electrode, and then the machine was operated by placing the appropriate chemical in the well and setting the dials to the rates prescribed in the charts. Defendant claimed the machine would cure anything.

Mrs. Metcalf, a special employee of the state Department of Health, went to the Drown Laboratories complaining of a pain in her stomach. The machine was explained to her and a course of treatments was prescribed, for a fee. She also arranged for indirect treatments for her three children, who had never been seen by any of the laboratory personnel. Mrs. Metcalf told defendant she suspected her daughter Sherry had mumps, and described the symptoms. Defendant made a diagnosis by the use of the machine and advised Mrs. Metcalf that Sherry did have mumps, and prescribed a course of treatment on the machine.

Mrs. Jorgensen was an inspector for the state Department of Health who also went to the Drown Laboratories posing as a patient. Her condition was diagnosed by use of the machine and a course of treatments was prescribed.

Moises Heilbron, a native of Colombia, had suffered a head injury during his childhood which left him subject to recurring epileptic seizures. He heard of Drown Laboratories and came in seeking a cure for his condition. Prior to that time he had been under the care of a neurologist who had prescribed medication for control of the seizures. Heilbron told Dr. Drown of his accident and the difficulties which he had had thereafter. She then prescribed a series of treatments for him on the machine, for which he paid $225. In defendant's presence, Dr. Drown advised Heilbron that in order for the laboratory treatments to be effective he must stop taking the medication. On two occasions during the treatment period Heilbron had a convulsive seizure in the laboratory. Defendant assured Heilbron that if he continued the treatment he would be restored to full health. Testifying on her own behalf, defendant admitted that she knew "many years ago" that the Drown treatment would not benefit a case of convulsive seizures, but they continued to treat Heilbron to benefit other parts of his body.

Dr. Moses A. Greenfield, a professor in the University of

California at Los Angeles school of medicine department of radiology, testified that he had examined the machines used in the Drown Laboratories and found they could not be used either to diagnose or treat any pathology. The dials on the outside of the box turned rotary switches, but all of the poles of the switches were wired in series, so that the flow of electricity through the switches would be the same regardless of the position to which any dial was turned. The wiring constituted a single electrical circuit passing through the box between the footplate and the electrode. The footplate was made of lead and the electrode was a copper alloy. When the two metals were placed in contact with the moist skin of the body there was a galvanic reaction generating a weak current of electricity in the circuit, which moved the needle on the ammeter. There was no other source of energy in the machine.

Defendant's contention in the trial court was that she did not understand the machine but that she honestly believed it would do everything her mother had claimed for it.

She admitted she knew that in 1951 Dr. Drown had been convicted in the federal court on a charge of misbranding the Drown instrument, and that the conviction had been based upon a finding that the claims made for the instrument were false.[2] Following that conviction, Dr. Drown discontinued any shipment of her instruments in interstate commerce.

After considering the nature of the device and the extravagant claims made for it, together with the fact that defendant held herself out to the world as professionally qualified to diagnose and treat illnesses in human beings, the court could reasonably infer that defendant had the fraudulent intent which is an element of the offense.

### The Recorded Conversations

Defendant claims she is entitled to a reversal because her statements to Mrs. Metcalf and Mrs. Jorgensen were recorded electronically without her consent. The record shows that each of the two investigators, while visiting the Drown Laboratories as pretended patients, carried in her handbag a Fargo transmitter. This device picked up the conversation and

[2]That conviction was affirmed in *Drown* v. *United States* (9th Cir. 1952) 198 F.2d 999. The *statute violated was the federal* Food, Drug and Cosmetic Act, 21 United States Code, section 301. The essence of the offense was selling in interstate commerce two instruments which were "misbranded," in that the literature which accompanied the instruments contained false and misleading therapeutic and diagnostic claims. The description of the instruments in that opinion leaves no doubt that they were substantially the same devices as those involved in the case at bench.

transmitted it by radio to a receiver and recording machine operated by other state agents who were outside. The transcriptions were used by Mrs. Metcalf and Mrs. Jorgensen to refresh their recollections before testifying, and then were placed in evidence at the request of defendant's counsel.

Furthermore on some occasions, telephone calls between defendant and Mrs. Metcalf were recorded by means of equipment installed in Mrs. Metcalf's home with her consent.

The People's case is in no way tainted by the use of this electronic method of insuring the accuracy of the testimony of Mrs. Metcalf and Mrs. Jorgensen.

In *Lopez* v. *United States* (1963) 373 U.S. 427 [10 L.Ed.2d 462, 83 S.Ct. 1381], a government agent carried a concealed recording device when he visited the defendant to discuss the latter's offer of a bribe. In affirming a conviction based upon the recorded conversation, the Supreme Court distinguished the "electronic eavesdropping" cases thus (at p. 439 [10 L.Ed.2d at p. 470]): "Indeed this case involves no 'eavesdropping' whatever in any proper sense of that term. The Government did not use an electronic device to listen in on conversations it could not otherwise have heard. Instead, the device was used only to obtain the most reliable evidence possible of a conversation in which the Government's own agent was a participant and which that agent was fully entitled to disclose. And the device was not planted by means of an unlawful physical invasion of petitioner's premises under circumstances which would violate the Fourth Amendment. It was carried in and out by an agent who was there with petitioner's assent, and it neither saw nor heard more than the agent himself."

The principle of the *Lopez* decision has been followed in *People* v. *Hinman* (1967) 253 Cal.App.2d 896, 902 [61 Cal. Rptr. 609], and *People* v. *Johnson* (1967) 249 Cal.App.2d 425, 428-429 [57 Cal.Rptr. 480].

The same rule is applicable where a telephone call is recorded by one party to the conversation. (*People* v. *Ragen* (1968) 262 Cal.App.2d 392, 397-398 [68 Cal.Rptr. 700]; *People* v. *Jones* (1967) 254 Cal.App.2d 200, 220 [62 Cal.Rptr. 304].)

*Katz* v. *United States* (1967) 389 U.S. 347 [19 L.Ed.2d 576, 88 S.Ct. 507] provides no support for defendant's contentions here. That case held illegal an electronic surveillance whereby the speech of a person in a telephone booth was recorded without the knowledge or consent of either party to the conversation.

Nothing in the *Katz* opinion dealt with a transmission or recording made by a party to a conversation and used in court only to refresh that party's recollection and confirm his testimony.[3]

*Berger* v. *New York* (1967) 388 U.S. 41 [18 L.Ed.2d 1040, 87 S.Ct. 1873] is not helpful to defendant here. That decision held unconstitutional a New York statute which authorized trespassory intrusions to make recordings without the consent of any of the parties to the conversation. The case does not deal at all with corroboratory recording of the kind approved in *Lopez*.

In *United States* v. *White* (7th Cir. 1969) 405 F.2d 838 a narcotics informer carried a concealed transmitter with him when he discussed a transaction with the defendant. Guilt was proved by the testimony of government agents who had heard the transmission. A majority of the Seventh Circuit Court of Appeals, relying upon the reasoning of *Katz, supra,* held the evidence to be inadmissible. The opinion of the Court of Appeals emphasized that the informer did not testify, so that the eavesdropping agents were the only persons who testified to the conversation. The *White* opinion expressly distinguished the *Lopez* case on that ground, and in so doing, made its rationale inapplicable to the case here.

Defendant's argument that the recordings were made inadmissible by former Penal Code section 653j[4] is refuted by the

---

[3]Furthermore, in *Desist* v. *United States,* 394 U.S. 244 [22 L.Ed. 2d 248, 87 S.Ct. 1030] [March 24, 1969], the Supreme Court said: ". . . to the extent *Katz* departed from previous holdings of this Court, it should be given wholly prospective application.

". . . . . . . . .

"In sum, we hold that *Katz* is to be applied only to cases in which the prosecution seeks to introduce the fruits of electronic surveillance conducted after December 18, 1967." The case at bench was tried prior to that date.

[4]Added by Stats. 1963, ch. 1886, § 1, p. 3871; repealed by Stats. 1967, ch. 1509, § 9, p. 3589. The superseding legislation is Penal Code section 630 et seq.

Section 653j provided: "(a) Every person or his authorized agent not a party to the communication who, intentionally and without the consent of any party to a confidential communication, by means of any electronic amplifying or recording device, eavesdrops upon or records a confidential communication, whether such communication is carried on among such parties in the presence of one another or by means of a telegraph, telephone or other device, except a radio, shall be punished by imprisonment in the county jail not exceeding one year, or by fine not exceeding one thousand dollars ($1,000), or by both such fine and imprisonment. . . . (d) Except as proof in a suit or prosecution for violation of this section, no evidence obtained as a result of eavesdropping upon or recording a confidential communication in violation of this section shall be admissible in any judicial, administrative, legislative or other proceed-

decisions interpreting that statute. The recordings were made between April and August 1963. Section 653j became effective September 20, 1963, and was repealed November 8, 1967. The trial of this action took place in 1966. Thus the statute was in effect at the time of trial but not at the time the recordings were made.

It has been decided that (1) the statute did not make inadmissible a recording made prior to September 20, 1963 (*People* v. *Fontaine* (1965) 237 Cal.App.2d 320, 330 [46 Cal.Rptr. 855]), and (2) the statute was not violated where one party to the conversation consented to the recording (*People* v. *La Peluso* (1966) 239 Cal.App.2d 715, 722 [49 Cal.Rptr. 85]; *People* v. *Fontaine, supra*, at p. 331). Furthermore, the statute contained a special exception with respect to law enforcement officers (see *People* v. *Apodaca* (1967) 252 Cal.App.2d 656 [60 Cal.Rptr. 782]).

### Entrapment

■ Defendant's claim of entrapment requires little discussion. That defense depends upon a showing that the intent to commit the crime originated in the mind of the investigator; and the fact that the investigator afforded defendant an opportunity to commit the crime does not constitute entrapment. (*People* v. *Benford* (1959) 53 Cal.2d 1, 9-11 [345 P.2d 928].) Here the evidence, as a whole, and defendant's own testimony in particular, established that the defendant's course of conduct began long before the investigation which led to the convictions. Defendant and her associates were prepared to accept money from anyone gullible enough to believe the claims they made.

### Expert Testimony

■ Defendant also argues it was error to receive the opinion of Dr. Greenfield because he was neither a medical doctor nor a chiropractor nor a student of "Drown therapy." Dr. Greenfield held the degree of doctor of philosophy in physics, and he specialized in medical physics, on the faculty of a state university medical school. It was not unreasonable for the trial court to conclude that the testimony of this witness could be helpful in evaluating the Drown machine as a diagnostic or therapeutic instrument. By this standard his testimony was admissible. (See *People* v. *Davis* (1965) 62 Cal.2d 791, 800

---

ing. . . . (h) Nothing in this section shall be construed as prohibiting law enforcement officers from doing that which they are otherwise authorized by law to do."

[44 Cal.Rptr. 454, 402 P.2d 142]. See also *People* v. *Chapman* (1962) 207 Cal.App.2d 557, 576 [24 Cal.Rptr. 568], holding admissible Dr. Greenfield's opinion about the efficacy of another kind of diagnostic machine.)

Defendant also argues that the witness Leake was not a qualified expert. Mr. Leake was a state investigator specializing in medical quackery. The brief fails to point out any testimony of this witness the defendant wishes to challenge, and we therefore have nothing to review.

### Conversations Through an Interpreter

■ Defendant's final contention is that Moises Heilbron's testimony should be stricken because the prosecution did not produce Marina Kerr, who translated some of the conversations between Heilbron and defendant.

Heilbron's native language is Spanish, and he gave his testimony in court through an interpreter. He testified that when he went to Drown Laboratories he could understand a little English, but not much. On some of his visits Marina Kerr, an employee of the laboratory, translated the conversations. On other occasions another employee, Winifred Wild, translated. Mrs. Wild was called as a witness and testified that she was fluent in Spanish and she had translated the Heilbron conversations at the laboratory accurately to the best of her ability. Mrs. Kerr was never called as a witness.

The record supports the finding of the trial court that Mrs. Kerr was an employee of Drown Laboratories and that she acted in the scope of her employment when she translated conversations of defendant and her associates with their patient Heilbron. The statements made by Mrs. Kerr to Heilbron in Spanish, purporting to come from defendant and her associates, are therefore binding upon defendant as the declarations of her agent. (See 2 Wigmore, Evidence (3d ed. 1940) § 668, p. 789; 6 *Id.*, § 1810, p. 281.) Heilbron's testimony in court as to the substance of the representations made to him through Mrs. Kerr is thus admissible.

The judgment is affirmed.

Jefferson, J., and Dunn, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied June 18, 1969.