[No. B007752. Second Dist., Div. Seven. Oct. 31, 1985.]

THE PEOPLE, Plaintiff and Respondent, v.
RENE MARK VILLARREAL, Defendant and Appellant.

**COUNSEL**

Stephen E. Webber, under appointment by the Court of Appeal, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Susanne C. Wylie and Robert S. Henry, Deputy Attorneys General, for Plaintiff and Respondent.

## Opinion

**SCHWAB (H. J.), J.*—**This appeal is from a judgment of conviction, arising out of a jury trial, of assault by means of force likely to produce great bodily injury with a deadly weapon in violation of section 245, subdivision (a)(1) of the Penal Code and the finding true of a great bodily injury allegation within the meaning of Penal Code section 12022.7.[1]

The facts revolve around the bellicose activities of appellant, Rene Mark Villarreal, on Christmas Day 1983. On that particular date, Leon Olivas was driving to a Christmas gathering in Pico Rivera. He was trying to park his car on the street in order to help a 92-year-old great-grandmother of a friend alight from the car. While his vehicle was stopped, appellant got out of his car, started walking toward Mr. Olivas and began threatening him. Mr. Olivas replied he did not even know appellant. Other people began coming out of the house where they were having a party and telling appellant to leave. After the great-grandmother had been taken inside the house and Mr. Olivas was in the process of parking, he looked toward the front of the house. He saw a lot of people running in the street and quite a bit of scuffling.

One of the people who had left the residence was Gil Sanchez. Mr. Sanchez had observed appellant and Mr. Olivas standing almost "nose to nose" and he got between them. Mr. Sanchez told appellant that they were having a family gathering and that he had no business there. Appellant called Mr. Sanchez a "punk" and there were other words. Mr. Sanchez told him to leave and appellant struck Mr. Sanchez. There was a fight between the two men. Eventually, the two men were pulled away from each other and a few minutes later appellant said a few things and left.

Mr. Sanchez cleaned himself and sat on the front porch of the house where the party was taking place for a few minutes, talking to Xavier Ruelas, a financial analyst for Northrup Corporation and the victim of the charged assault. Mr. Ruelas had decided to go out for some air with Mr.

---

*Assigned by the Chairperson of the Judicial Council.

[1]An allegation was also set forth relative to appellant's having been convicted of a prior serious felony within the meaning of Penal Code section 667, subdivision (a). Appellant admitted the truth of the prior conviction after guilt had been established by the jury.

Sanchez' son, Gil Sanchez, Jr. Two figures came towards them. One of them stopped and the other kept coming. As that person kept coming, he was recognized by Mr. Ruelas as being appellant whom he had seen fighting Mr. Sanchez a half-hour to 45 minutes earlier. Mr. Ruelas ordered Gilbert Sanchez, Jr., to return to the house and he reluctantly went inside the home.

Appellant threatened Mr. Ruelas and referred to him as "Gil." Mr. Ruelas said he was not "Gil" and appellant told him not to lie. Mr. Ruelas told him again he had the wrong individual, that his name was not "Gil." Appellant swung at Mr. Ruelas with an object in his hand which appeared to be the base of a bottle. Meanwhile, Mr. Olivas, who had been inside the residence, opened the door and saw appellant punching Mr. Ruelas' face in a rapid manner. He observed appellant strike Mr. Ruelas about five times before he got out the front door. When he got out the front door Mr. Ruelas was still being beaten by appellant. Appellant backed away with his right hand behind his right buttock.

Mr. Ruelas as a result of the assault stayed in the hospital for five days and underwent an operation. According to Dr. Michael Rubino who examined Mr. Ruelas and according to the X-rays which were taken, Mr. Ruelas had multiple fractures of the nasal bones which had been displaced by reason of blunt trauma. These bones had been broken and were not "in the original place." Since the assault, Mr. Ruelas had been on medication to help him breathe and had sinus congestion, headaches and the inability to sleep or concentrate. In addition, Mr. Ruelas suffered about two broken teeth and had trouble chewing for one and a half months.

The defense was to the effect that appellant was attempting to defend himself in a melee arising out of an altercation over a traffic jam.

The issues raised on appeal relate solely to the great bodily injury allegation within the meaning of Penal Code section 12022.7.[2]

■ Appellant contends that the trial court erred in instructing the jury that: "A bone fracture constitutes a substantial and significant physical injury within the meaning of Penal Code Section 12022.7." However, the aforementioned instruction was properly given because a bone fracture, un-

---

[2]Penal Code section 12022.7 reads in pertinent part as follows: "Any person who, with the intent to inflict such injury, personally inflicts great bodily injury on any person other than an accomplice in the commission or attempted commission of a felony shall, in addition and consecutive to the punishment prescribed for the felony or attempted felony of which he has been convicted, be punished by an additional term of three years, unless infliction of great bodily injury is an element of the offense of which he is convicted. [¶] As used in this section, great bodily injury means a significant or substantial physical injury."

der the circumstances of this case, as a matter of law, ". . . constitutes a substantial and significant physical injury within the meaning of Penal Code section 12022.7." The language utilized in the instruction, which appellant challenges on appeal, was taken from the case of *People* v. *Johnson* (1980) 104 Cal.App.3d 598, 609 [164 Cal.Rptr. 69]. However, appellant urges that *Johnson* should be limited to its facts, namely, that the jaw fracture sustained in the *Johnson* case be deemed as a significant and substantial physical injury for purposes of Penal Code section 12022.7. However, *Johnson* cannot be read so narrowly.

The court in *Johnson* discussed the earlier decision of *People* v. *Caudillo* (1978) 21 Cal.3d 562, 581 [164 Cal.Rptr. 859, 580 P.2d 274], which opinion discussed in detail the parameters of "great bodily injury." The *Johnson* court, at page 609, stated in pertinent part the following: "It is common knowledge that a bone fracture is not merely a transitory bodily distress, but a severe and protracted injury which causes significant pain and requires considerable time to heal. In other words, in case of a bone fracture the double criteria set out in *Caudillo* are present. This type of injury is of both sufficient severity and permanence and hence constitutes a substantial and significant physical injury within the delineation of both *Caudillo* and the statute.

"In reaching this conclusion we are supported not only by common sense and logic, but also by the legislative history of section 12022.7, statutes *in pari materia* and the case law. As originally enacted in 1976, section 12022.7 defined great bodily injury as: 'a serious impairment of physical condition, which includes any of the following: (a) Prolonged loss of consciousness. (b) Severe concussion. (c) Protracted loss of any bodily member or organ. (d) *Protracted impairment* of function of any bodily member or organ or *bone*. (e) A wound or wounds requiring extensive suturing. (f) Serious disfigurement. (g) Severe physical pain inflicted by torture.' (Italics added.)

"The Supreme Court spelled it out that the 1977 amendment to section 12022.7, eliminating a detailed description of great bodily injury: 'was not intended to lessen the magnitude of bodily injury required by the 1976 detailed definition of great bodily injury. Rather, it appears that the 1977 amendment to Penal Code section 12022.7 was designed to preclude the possibility that the 1976 detailed definition of great bodily injury be construed as all inclusive, leaving no latitude to the trier of fact to find a bodily injury of equal magnitude to the categories specified in the detailed definition but not coming literally within any category set forth therein.' (*Caudillo,* 21 Cal.3d at p. 582.)" (Italics in original.)

The fact that *Johnson* is not limited to the situation with a bone fracture of the jaw, but applies to bone fractures in general, can be seen from the following language of the California Supreme Court in *People* v. *Burroughs* (1984) 35 Cal.3d 824, 831 [201 Cal.Rptr. 319, 678 P.2d 894]: ". . . [the] term 'serious bodily injury' is defined in Penal Code section 243—which establishes appropriate punishments for the crime of battery when committed under various circumstances—as '[a] serious impairment of physical condition, including, but not limited to the following: loss of consciousness; concussion; *bone fracture;* protracted loss or impairment of function of any bodily member or organ; a wound requiring extensive suturing; and serious disfigurement.' Pursuant to this definition, a broken arm or leg would constitute serious bodily injury—and by implication, great bodily harm as well. While painful and debilitating, such bone fractures clearly do not, by their nature, jeopardize the life of the victim.

"*In addition, we acknowledge that '"[s]erious bodily injury" and "great bodily injury" are essentially equivalent elements.'* [Citations.]" (Italics added.) (See also *People* v. *Johnson, supra,* 104 Cal.App.3d at p. 609; *People* v. *Kent* (1979) 96 Cal.App.3d 130, 136 [158 Cal.Rptr. 35].)

Thus, since "great bodily injury" and "serious bodily injury" are essentially equivalent terms, and since section 243 of the Penal Code similarly states that a "bone fracture" constitutes "serious bodily injury," there is no doubt that the jury was properly instructed. As a matter of law a bone fracture under the circumstances herein, constitutes a "significant or substantial injury" within the meaning of Penal Code section 12022.7.

■ Appellant further urges that the trial court erred in ruling that his brother, Dr. Stephen Villarreal, because he was an unlicensed medical school graduate, was incapable as a matter of law of giving medical opinions. In this regard, appellant appears to be correct but under the circumstances there was no prejudice. Dr. Villarreal testified that he graduated from medical school and was currently an intern at the U.S.C. County General Hospital awaiting to get his license. He testified that he examined his brother after the altercation and described appellant's condition and the treatments that he gave him.

He also testified as to various types of diagnostic studies which were performed which he learned in his experiences as a doctor in medical school, as well as the function and utilization of paramedics. In this regard he described certain forms which paramedics use in interacting with physicians. Dr. Villarreal was asked if paramedics were trained to be ". . . specific and careful in what they write down on these forms?" Appellant's brother answered in the affirmative. There was an objection on the basis of

lack of foundation which was properly sustained and the jury instructed to disregard the answer. (Evid. Code, § 702, subd. (a); *People* v. *Demond* (1976) 59 Cal.App.3d 574, 588 [130 Cal.Rptr. 590].)

Dr. Villarreal then began to discuss the medical records of Mr. Ruelas, noting that he had had the opportunity to review them. Defense counsel attempted to ask Dr. Villarreal relative to these records if he could determine what Mr. Villarreal's "level of consciousness was." The trial court refused to allow him to answer, finding he was not competent to give a medical opinion as he was not licensed to practice at that point, but was just an intern. In the court's determination one had to be licensed to practice medicine in order to give a medical opinion.

Defense counsel then asked Dr. Villarreal, "Without giving any medical opinion as to a particular situation, does a person who has received a broken nose in a fight, is that in and of itself considered a serious injury?" The trial court sustained an objection on the grounds that he was asking for an opinion.

It is true that whether or not an individual is qualified to testify as an expert is a question for the trial court which will very rarely be set aside. (*People* v. *Chavez* (1985) 39 Cal.3d 823, 828 [218 Cal.Rptr. 49, 705 P.2d 372]; *People* v. *Maler* (1972) 23 Cal.App.3d 973, 982 [100 Cal.Rptr. 650].) However, it cannot be said as a matter of law that an individual is not qualified to give a medical opinion just because that person is not a licensed physician. (*Chadock* v. *Cohn* (1979) 96 Cal.App.3d 205, 209 [157 Cal.Rptr. 640].) Because of the dramatic growth of diverse interdisciplinary studies in recent times, often individuals of different nonphysician professions are called upon to give medical opinions or at least opinions involving some medical expertise. (*People* v. *Rance* (1980) 106 Cal.App.3d 245, 255 [164 Cal.Rptr. 822] (nurse); *People* v. *Young* (1970) 12 Cal.App.3d 878, 881 [90 Cal.Rptr. 924] (laboratory technician); *People* v. *Chatfield* (1969) 272 Cal.App.2d 141, 148 [77 Cal.Rptr. 118] (physicist).) In this regard, although Dr. Villarreal was appellant's brother, he had at the time of testifying completed medical school and was undergoing his internship at U.S.C. County General Hospital. Therefore the absence of his medical license would not, in and of itself, make him incapable as a matter of law from rendering a medical opinion. ■ However, based upon the posture of the case, appellant cannot posit a reversal of the great bodily injury allegation.

As has been discussed, "a bone fracture constitutes substantial and significant physical injury within the meaning of section 12022.7." There is nothing in the record to reflect that Dr. Villarreal would have testified or even been able to testify that there were no existing bone fractures which

resulted from his brother's attack on Mr. Ruelas. Defense counsel's question to Dr. Villarreal of whether a broken nose received in a fight is, in and of itself, considered a serious injury was properly sustainable as being irrelevant unless he could testify that Mr. Ruelas did not suffer any broken nasal bones or at the very least give a medical opinion which would cast doubt upon that issue. Without an offer of proof, or a showing in the record that Dr. Villarreal would so testify, no reversible error is predicated. (*People* v. *Asta* (1967) 251 Cal.App.2d 64, 75-77 [59 Cal.Rptr. 206], overruled on another point in *People* v. *Bolton* (1979) 23 Cal.3d 208, 213 [152 Cal.Rptr. 141, 589 P.2d 396]; *People* v. *Jones* (1960) 177 Cal.App.2d 420, 425 [2 Cal.Rptr. 305]; *People* v. *Bryant* (1958) 157 Cal.App.2d 528, 533 [321 P.2d 45]; *People* v. *Monson* (1951) 102 Cal.App.2d 308, 313 [227 P.2d 521].)

It is to be noted that the defense failed to proffer any expert testimony to contradict the existence of Mr. Ruelas' nasal bone fractures. The absence of such testimony, in light of the fact that Dr. Villarreal himself was relying on medical reports and not apparently on any firsthand information of the injuries concerning Mr. Ruelas, supports an inability to rebut the existence of the broken nasal bones, even if he had been allowed to give a medical opinion. As such, the finding of true of the great bodily injury allegation is fully supported by the record and the judgment of conviction is affirmed.

Lillie, P. J., and Johnson, J., concurred.