Filed 8/12/14  P. v. Dominguez CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>　　　　Plaintiff and Respondent,<br><br>　　　　　v.<br><br>CYNTHIA GONZALEZ DOMINGUEZ,<br><br>　　　　Defendant and Appellant. | F067131<br><br>(Super. Ct. No. CF03906078)<br><br>**OPINION** |

-ooOoo-

### THE COURT*

APPEAL from a postjudgment order of the Superior Court of Fresno County. Wayne R. Ellison, Judge.

Paul Bernstein, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Carlos A. Martinez and Catherine Tennant Nieto, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

---

\*　　　Before Levy, Acting P.J., Detjen, J. and Franson, J.

Following a jury finding that appellant, Cynthia Gonzalez Dominguez, currently poses a substantial danger of physical harm to others because of a severe mental disorder that is not in remission or cannot be kept in remission, the trial court extended appellant's involuntary mental health commitment under the Mentally Disordered Offender Act (Pen. Code, § 2960 et seq.) for one year. On appeal, appellant contends the evidence was insufficient to support the extension of her commitment as a mentally disordered offender (MDO). Specifically, she argues that the evidence was insufficient to establish beyond a reasonable doubt that she posed a substantial danger of physical harm to others by reason of a mental disorder or that she lacked the volitional capacity to control dangerous behavior. We affirm.

## FACTS

### *Testimony of Terri Scher, LCSW*

Terri Scher testified to the following: She is a licensed clinical social worker (LCSW). At the time of trial, she had been employed in that capacity for five months by a Veterans Administration hospital. Prior to that, she had been employed for seven years as an LCSW by a conditional-release program known as CONREP, where her duties included group and individual psychotherapy of persons suffering from mental disorders, including persons with schizoaffective disorder with a bipolar component. As an LCSW, she is qualified to make mental health diagnoses.

In April 2012, in response to a report to CONREP from appellant's husband that appellant, who was on outpatient status, was "acting strange," Scher went to appellant's home where she found appellant outside, using a hose to "water[] the couch down to clean it." The kitchen chairs had been "destroyed," and appellant explained she had "broke[n] them up with her fist" and was "going to remodel" them. Appellant's baby was crying, and appellant said she (appellant) was tired and "couldn't handle the baby crying." Appellant, at Scher's request, showed Scher her medication and Scher,

2

observing that appellant had not taken her medication that day, asked her to do so. Appellant complied.[1]

Scher became appellant's "primary clinician" in August 2012, after appellant was remanded from the CONREP outpatient program to the Northstar residential treatment program, a more restrictive treatment option than CONREP, for failing to follow the CONREP program rules. Scher spoke with appellant approximately five times when appellant was at Northstar.

Scher reviewed "reports from other clinicians." She also reviewed reports which revealed the following regarding appellant's "criminal history": Appellant's "committing offense" was "assaulting a hospital worker" in a hospital emergency room when appellant "became paranoid[,] thinking that the … worker was talking about [appellant's] weight." Appellant "knocked the … worker down and then started banging her head against the ground." Appellant also "had one … juvenile offense, stabbing a female peer in 1990."

Scher, based on her review of "criminal history reports," "mental health reports," the April 2012 incident, and Scher's meetings with appellant at Northstar, diagnosed appellant as suffering from a "severe mental disorder," viz., "schizoaffective disorder[,] bipolar type." Persons with that disorder "have psychotic symptoms like hallucinations, delusions, … not thinking clearly, [and] disorganized thinking."

Based on her review of "reports" and her experience "assisting" appellant, Scher, when asked how appellant's "specific mental disorder impacted her day-to-day living," responded: "Sometimes she wouldn't take her medications or would skip a medication. And I don't necessarily think she was unwilling. But because she was impacted by her mental illness she didn't take it." Appellant's failure to take her medications initiated a "vicious cycle," in that "[i]f you are not taking your medication like you are supposed to, then you have your symptoms increase," including delusions, hallucinations and

---

[1] We refer to the incident described above as the April 2012 incident.

3

"disorganized thoughts." Scher opined that if appellant was unsupervised and was experiencing this "cycle" in which appellant's symptoms were increasing, she would not "come out of it." She would need treatment and "her medication would have to be adjusted." "Because [appellant] has to have her medication in order to function the best that she can," Scher opined further, if appellant was living on her own without supervision, she "would [not] do very well."

Asked if she believed appellant "posed a substantial danger of harm[] to others" at the time Scher last saw her at Northstar, in September 2012, approximately seven and one-half months prior to the trial in April 2013, Scher answered, "Yes," and explained that appellant could "have … disorganized thinking," as in the April 2012 incident, that could lead her to have "delusions [that] someone is out to get her," "[a]nd she could harm them." Scher further testified that "if [appellant] had her child with her and she was not taking her medication and had those symptoms, … I believe that the child could suffer from that."[2] In Scher's opinion, the "likelihood" was "[h]igh" that appellant "would become psychotic and possibly reoffend without the continued treatment and supervision."

### Testimony of Jonathan Berry, M.D.

Jonathan Berry, M.D., testified to the following: He is a staff psychiatrist at Napa State Hospital (NSH), where his duties include diagnosing and treating mental illness. The last time he encountered appellant in a professional setting was in February 2013, when appellant was admitted to NSH, where Berry worked in the admission unit. Appellant did not exhibit psychotic symptoms during the interview or during her time in the admission unit, but after reviewing records and meeting with appellant, Berry, based on those records and appellant's "report of historic symptoms" during the interview, diagnosed her as suffering from schizoaffective disorder, bipolar type. Persons with this

---

[2] Appellant testified she has three children. Scher testified she (Scher) was aware appellant did not have custody of her children.

4

disorder display a combination of "psychotic symptoms," including "markedly disorganized thinking like auditory hallucinations[] [and] delusions, combined with significant mood symptoms," viz., depression or mania. Appellant reported to Berry "having depressive mood" with "significant decrease in energy," "suicidal thoughts" and a feeling of being "mentally slow and physically slow" that "[s]ometimes … goes with depression"; "manic symptoms," including "decreased need for sleep" and "grandiose sense of self"; "delusional thoughts"; and "feeling paranoid," i.e., thinking that people had "said something negative about her" but concluding later that "[t]hat isn't what really happened."

Appellant's mental illness could "substantially impair" her "thought processes," "perception of reality" and "emotional process or judgment," and could "grossly impair her behavior." She requires medication to control the symptoms of her disorder.

Berry did not do a "formal assessment" of whether appellant's mental illness "was an aggravating factor in her underlying crimes," but "[i]t certainly sounded like that was the case," in that when she spoke with Berry about the assault on the hospital worker, she recognized, in retrospect, that her belief that "ER staff members were saying negative things about her weight" was "maybe … [not] the case."

At the time Berry spoke with appellant at her admission, "there was a suggestion of a bit of paranoia." She "seemed a little bit hypervigilant." She thought that her "peers" were looking at her when she was in the bathroom, but she recognized that "[m]aybe [she was] running a little paranoid."

If appellant stopped taking her medication, Berry "would expect that she would be more likely to have recurrence of manic episodes or depressive episodes and return of … auditory hallucinations, paranoia[,] delusional beliefs, that sort of thing."

When asked if appellant, if not taking her medications and not receiving treatment, would present a "substantial danger of physical violence to others," Dr. Berry responded that "she has a chronic moderate risk for violence." He was "not sure about the term

5

'substantial.'" He explained, "We use [the terms] low, moderate, high or severe." He was "not sure where [the term] substantial fits," but "[m]oderate," though "[l]ess than severe," is "significant."

*Appellant's Testimony*

Appellant testified to the following: She was pregnant around October 2010 and when she first found out, in March 2010, while she was in the outpatient program, her obstetrician directed her to immediately stop taking her psychotropic medications. The incident involving watering the couch occurred not in April 2012, but in June 2010, when she was off those medications. She began taking them again in December 2010.

She suffers from a "thought disorder similar to … schizophrenia," which also includes a "severe mood disorder" and causes "disorganized thinking." Her disorder does not "caus[e] [her] … difficulty controlling [her] behavior." She began taking a medication called Invega in November 2011, and since that time she has experienced some disorganized thinking, but no delusions or hallucinations and she has engaged in no violent behavior.

If released from NSH, appellant would live at "The Lighthouse," a residential treatment program, or, if she were placed on a waiting list for that program, at her mother's home. She would continue to take her medications.

## DISCUSSION

Appellant first contends reversal is required because the evidence was insufficient to support findings that (1) she suffers from a severe mental disorder, and (2) that as a result of that disorder, she poses a substantial danger of physical harm to others.

*Legal Background*

The Mentally Disordered Offender Act

"'The Mentally Disordered Offender Act (MDO Act), enacted in 1985, requires that offenders who have been convicted of violent crimes related to their mental disorders, and who continue to pose a danger to society, receive mental health treatment

6

... until their mental disorder can be kept in remission.'" (*Lopez v. Superior Court* (2010) 50 Cal.4th 1055, 1061, disapproved on another point in *People v. Harrison* (2013) 57 Cal.4th 1211, 1230, fn. 2.) "Commitment as an MDO is not indefinite; instead, '[a]n MDO is committed for ... one-year period[s] and thereafter has the right to be released unless the People prove beyond a reasonable doubt that he or she should be recommitted for another year.'" (*Id*. at p. 1063.) "A recommitment under the [MDO] law requires proof beyond a reasonable doubt that (1) the patient has a severe mental disorder; (2) the disorder 'is not in remission or cannot be kept in remission without treatment'; and (3) by reason of that disorder, the patient represents a substantial danger of physical harm to others. (Pen. Code, § 2970.)"**3** (*People v. Burroughs* (2005) 131 Cal.App.4th 1401, 1404.)

Standard of Review

On appeal, we assess the sufficiency of the evidence to support an MDO commitment under the substantial evidence standard. (*People v. Clark* (2000) 82 Cal.App.4th 1072, 1082-1083 (*Clark*).) This requires us to determine "whether, on the whole record, a rational trier of fact could have found that defendant is an MDO beyond a reasonable doubt, considering all the evidence in the light which is most favorable to the People, and drawing all inferences the trier could reasonably have made to support the finding. [Citation.] ""'Although we must ensure the evidence is reasonable, credible, and of solid value, nonetheless it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts on which that determination depends.'""" (*Ibid*.)

A single opinion by a psychiatric expert that a person is currently dangerous due to a severe mental disorder can constitute substantial evidence to support the extension of a commitment. (Cf. *People v. Zapisek* (2007) 147 Cal.App.4th 1151, 1165 [section 1026.5

**3**     We sometimes refer to the third component of the showing required for recommitment under the MDO Act as the dangerousness component.

7

commitment].) However, "expert medical opinion evidence that is based upon a "'guess, surmise or conjecture, rather than relevant, probative facts, cannot constitute substantial evidence.""" (*In re Anthony C.* (2006) 138 Cal.App.4th 1493, 1504 (*Anthony C.*).)

*Analysis*

Both Scher and Berry opined, based on information acquired through personal contact with appellant and review of records, that appellant suffers from schizoaffective disorder, bipolar type, a severe mental disorder, the symptoms of which include delusions, hallucinations and, in Berry's words, "markedly" disorganized thinking. In addition, both clinicians testified that appellant needed medication to control her psychotic symptoms. Under the principles of appellate review summarized above, this evidence was sufficient to support the jury's finding that appellant suffered from a severe mental disorder that was not in remission or could not be kept in remission without treatment.

The evidence was also sufficient to support the jury's finding as to the dangerousness component. Scher testified, based on her review of records—which showed that on occasion, appellant, while hospitalized, failed to take her medication—and on her direct personal experience with appellant—which included the April 12 incident in which appellant, while on outpatient status experienced extreme disorganized thinking after failing to take her medication—that appellant sometimes would fail to take her medications, such failure would cause her to experience psychotic symptoms, including delusions, and that if this occurred while appellant was "unsupervised," she would not be able to stop the "cycle" of worsening symptoms on her own. As a result, Scher opined further, appellant posed a substantial danger to others as a result of her mental illness because such delusions could include the false belief that "someone was out to get [appellant]," and that appellant, acting on this belief, could harm someone. This opinion finds support in the records Scher reviewed which indicated that appellant committed her commitment offense, an assault, when she "became paranoid," i.e.,

8

formed the delusional belief that other persons were talking about her weight. Scher concluded that the "likelihood" was "[h]igh" that appellant "would become psychotic and possibly reoffend without the continued treatment and supervision." Based on the foregoing, we conclude that from Scher's testimony alone, the jury reasonably could conclude that appellant posed a substantial danger to others as a result of a severe mental illness that was not in remission or could not be kept in remission without treatment.

Berry's testimony provides further support for the jury's finding of dangerousness. As indicated above, Berry testified that appellant's mental illness would "substantially impair" her thought processes, perception of reality and judgment; and that he "would expect" that if appellant stopped taking her medication she would be "more likely" to experience psychotic symptoms, including delusions.

Appellant challenges the sufficiency of the evidence supporting the jury's findings on a number of grounds. First, she argues that Scher's testimony regarding appellant's diagnosis and Scher's opinion regarding appellant's potential for causing physical harm to others, cannot, as a matter of law, support the jury's findings and, indeed, must be totally disregarded, because Scher, as an LCSW, was not licensed to make diagnoses or "assess and predict violence." (Unnecessary emphasis and capitalization omitted.)[4] We disagree.

We assume without deciding that making mental health diagnoses and assessments of the likelihood of a mentally ill person causing harm to others are beyond the scope of an LCSW's license. This would not establish, and appellant cites no case holding or even suggesting, that the testimony of an LCSW on matters beyond the scope of his or her license is, as a matter of law, incompetent. Evidence Code section 720, subdivision (a)

---

[4]    The People argue that appellant has forfeited this challenge to Scher's testimony because appellant did not object to Scher's testimony on the ground that as an LCSW she was not licensed to make diagnoses or assess dangerousness. We assume without deciding that this contention is cognizable on appeal.

9

provides, in relevant part, that "[a] person is qualified to testify as an expert if he has special knowledge, skill, experience, training, or education sufficient to qualify him as an expert on the subject to which his testimony relates." Thus the key question is not the scope of matters covered by Scher's LCSW license, but the scope of her knowledge of the matters about which she testified. (Cf. *Agnew v. City of Los Angeles* (1950) 97 Cal.App.2d 557, 565-566 ["The determinative test [for a medical expert witness] is whether the witness has disclosed sufficient knowledge of the subject to entitle his opinion to go to the jury"]; *People v. Villarreal* (1985) 173 Cal.App.3d 1136, 1142 ["it cannot be said as a matter of law that an individual is not qualified to give a medical opinion just because that person is not a licensed physician"].)

Scher testified to the following: She worked for seven years for CONREP, during which time she acted as the primary clinician for persons with mental disorders, including schizoaffective disorder, providing group and individual psychotherapy, and underwent training on an annual basis in mental health forensics. Also during that time, she worked for the "Counseling and Psychotherapy Center" on a part-time basis.

The jury reasonably could conclude, based on Scher's testimony, that Scher, as a result of the knowledge she had gained through her experience and training, was qualified to diagnose appellant as suffering from a severe mental disorder and to render an opinion that appellant, because of that disorder, posed a substantial danger to others. (See Evid. Code, § 720, subd. (b) ["A witness' special knowledge, skill, experience, training, or education may be shown by any otherwise admissible evidence, including his own testimony"].) Further, the jury reasonably could credit Scher's testimony on these points.

Appellant next argues that Scher's testimony was, in any event, insufficient to establish that appellant suffers from a severe mental disorder because, she asserts, Scher did not adequately state the basis for her diagnosis of appellant. We disagree. Scher testified that she based her diagnosis on reports regarding appellant's criminal history and mental health, and on her in-person contacts with appellant. Appellant's argument that

10

Scher did not adequately state the facts and reasoning underlying her diagnosis is, in essence, a claim that we should reweigh the evidence. We will not do so. As indicated earlier, that is not the function of an appellate court. (*Clark*, *supra*, 82 Cal.App.4th at pp. 1082-1083.)

Appellant also attacks Scher's opinion testimony that appellant poses a substantial physical danger to others as a result of a severe mental disorder. As indicated above, Scher's testimony as to the dangerousness component can be summarized as follows: It was likely appellant would fail to take her medications if unsupervised; if she failed to take her medications, it was likely she would experience psychotic delusions, including delusions that other persons were "out to get her"; and she would respond to such delusions with physical violence.

Scher's conclusion was supported by evidence in appellant's records, cited by Scher, that appellant assaulted a hospital worker while under the delusion that other persons were talking about her weight. Appellant challenges this point, arguing that this assault did not support Scher's conclusion that appellant posed a danger of physical harm to others "by reason of" a severe mental disorder because, notwithstanding the records upon which Scher relied that showed, according to Scher's testimony, that appellant committed the attack when she "became paranoid," it was not established that the assault was caused by a mental disorder.

Appellant's point is not well taken. We are not compelled to conclude, as appellant asserts, that Scher used the word "paranoid" in "a lay, non-clinical sense." As indicated above, we consider all evidence in the light most favorable to the jury's findings and draw all inferences that the jury could reasonably have made. The jury reasonably could conclude from Scher's reference to appellant becoming paranoid that Scher based her opinion in part on evidence that appellant committed the assault as a result of being under the delusional belief that other persons were speaking ill of her.

11

Appellant also argues that Scher's opinion that appellant posed a substantial danger of physical harm to others was unsupported because the April 12 incident did not involve violence; appellant's outpatient status was revoked for not following rules, not for acting violently; and, she asserts, there was no evidence she ever experienced the delusion that someone was "out to get her." These claims amount to a request that we reweigh the evidence. As indicated earlier, such is not the proper function of an appellate court.

Appellant also argues that Dr. Berry's testimony was insufficient to support the jury's findings. She first argues Berry offered inadequate support for his diagnosis of schizoaffective disorder because he noted that in his contacts with appellant he observed only "irritability" but no psychotic symptoms. There is no merit to this contention. Berry testified he based his diagnosis on review of the records and appellant's reports of "historic" psychotic symptoms, both proper bases for expert opinion.

Finally, appellant challenges Berry's opinion testimony that appellant presents a "chronic, moderate risk for violence." Appellant contends Berry "did not support this conclusion with the facts and reasoning necessary to constitute substantial evidence." (See *Pacific Gas & Electric Co. v. Zuckerman* (1987) 189 Cal.App.3d 1113, 1135 ["Where an expert bases his conclusion upon assumptions which are not supported by the record, upon matters which are not reasonably relied upon by other experts, or upon factors which are speculative, remote or conjectural, then his conclusion has no evidentiary value"].) We need not address this contention, because, as demonstrated above, Scher's testimony is sufficient to establish the dangerousness component, and is supported by other parts of Berry's testimony.

***Volitional Capacity***

"[T]he safeguards of personal liberty embodied in the due process guaranty of the federal Constitution prohibit the involuntary confinement of persons on the basis that they are dangerously disordered without 'proof [that they have] serious difficulty in

12

controlling [their dangerous] behavior." (*People v. Williams* (2003) 31 Cal.4th 757, 759 (*Williams*), quoting *Kansas v. Crane* (2002) 534 U.S. 407, 413 (*Crane*).) Invoking this principle, appellant argues reversal is required because "[t]here was … no evidence that [appellant] lacked the volitional capacity to control dangerous behavior." We disagree.

In *In re Howard N.* (2005) 35 Cal.4th 117 (*Howard N.*), which dealt with the statutory scheme providing for the extended detention of dangerous juveniles (Welf. & Inst. Code, § 1800 et seq.), our Supreme Court held that to maintain its constitutionality under United States Supreme Court and California Supreme Court authority,[5] that scheme should be interpreted to contain a requirement that the person's mental deficiency, disorder, or abnormality caused serious difficulty in controlling his or her behavior. (*Howard N.*, at pp. 132-133.) The court further held that failure to instruct on volitional control, coupled with a lack of evidence that the mental abnormality caused the defendant serious difficulty controlling his behavior, was not harmless error. (*Id.* at p. 138.)

The court, however, distinguished *Williams*, *supra*, 31 Cal.4th 757, where it was held the lack of a volitional control instruction was harmless, on the ground that in that case, "the mental abnormality with which defendant was diagnosed[] was 'a mental disorder characterized by intense and recurrent fantasies, urges, and behaviors about sex with nonconsenting persons, which symptoms persist for six months or more and cause significant dysfunction or personal distress.'" (*Howard N.*, *supra*, 35 Cal.4th at p. 138.) Had such evidence been presented, the court suggested, a rational jury could have found that the defendant was volitionally impaired. The evidence in the instant case that appellant's mental illness causes her to suffer from delusions, and that such delusions could cause appellant to physically harm others, was similar to the evidence in *Williams*

---

[5]     See *Crane*, *supra*, 534 U.S. at pp. 412-413; *Kansas v. Hendricks* (1997) 521 U.S. 346, 358, 360; *Williams*, *supra*, 31 Cal.4th at p. 759; *Hubbart v. Superior Court* (1999) 19 Cal.4th 1138, 1156, 1158.

that the defendant in that case had intense and recurrent fantasies which caused significant dysfunction. Such evidence was sufficient to establish that appellant had serious difficulty in controlling her behavior.

We find instructive *People v. Putnam* (2004) 115 Cal.App.4th 575 (*Putnam*). In that case, the patient challenged his MDO recommitment on the basis the jury was not adequately instructed on the requirement that the prosecution establish he had serious difficulty in controlling his behavior. (*Id*. at p. 579.) Instructions given informed the jury of the following: "[I]n order to find that appellant had a severe mental disorder, it had to find that he had 'an illness or disease or condition that substantially impair[ed] [his] thoughts, perception of reality, emotional process, or judgment, or which grossly impair[ed] [his] behavior'"; "in order to find that the disorder was not in remission, the jury had to find that 'the overt signs and symptoms of the severe mental disorder' were not under control"; and the jury "had to find that '*by reason* of such severe mental disorder, [appellant] represents a substantial danger [of] physical harm to others.' (Italics added.)" (*Id.* at p. 582.) The court held there was no instructional failure because "the instructions given …, which tracked the language of the MDO statute, necessarily encompassed a determination that appellant had serious difficulty in controlling his violent criminal behavior …." (*Ibid*.)

Here, as demonstrated above, substantial evidence supported each of the points covered in the jury instructions given in *Putnam*. And, as *Putnam* explains, these points "necessarily encompass[]" (*Putnam*, *supra*, 115 Cal.App.4th at p. 582) the showing required to establish serious difficulty in controlling behavior. Therefore, appellant's challenge to the sufficiency of the evidence that she had serious difficulty controlling her behavior fails.

## DISPOSITION

The postjudgment recommitment order is affirmed.

14