[No. E004972. Fourth Dist., Div. Two. Mar. 21, 1989.]

THE PEOPLE, Plaintiff and Respondent, v.
KENNETH JAMES, Defendant and Appellant.

COUNSEL

Mark D. Greenberg, under appointment by the Court of Appeal, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Steve White, Chief Assistant Attorney General, Janelle B. Davis and Carl H. Horst, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**DABNEY, J.**—Defendant Kenneth Jerome James was charged in an information in count 1 with burglary (Pen. Code, § 459),[1] in count 2 with penetration by a foreign object (§ 289, subd. (a)), in counts 3 and 4 with rape (§ 261, subd. (2)), in counts 5 and 7 with robbery in an inhabited dwelling (§ 213.5), and in count 6 with vehicle theft (Veh. Code, § 10851). A special allegation of use of a deadly weapon, a knife, was charged as to count 7 (former § 12022, subd. (b); now § 12022, subd. (d).) Finally, the information alleged two prior felony convictions. (§§ 667, 1192.7.)

James pleaded not guilty and not guilty by reason of insanity, waived his right to a trial by jury, and agreed to submit the matter to the court based on the record of the preliminary hearing. The court found James guilty as charged. In a separate court trial of the prior conviction allegations, the court struck the first allegation and found the second allegation to be true.

At the separate jury trial on James's sanity, the jury found that James was sane at the time of the commission of the offenses. The trial court sentenced James to the aggravated term of six years on count 7 plus a consecutive one-year enhancement for use of a weapon. The court further sentenced James to a consecutive eight-year term on count 3 and a consecutive five-year term for the prior felony conviction. The court stayed the sentences for the remaining counts.

James contends on appeal that: (1) the evidence was insufficient to sustain the finding that he used a knife during the commission of robbery; (2) the trial court abused its discretion in ruling that a witness was unqualified to give a diagnostic impression of James; (3) the court erred in giving the flight instruction during the sanity phase of James's trial; (4) the court failed to

---

[1] All statutory references are to the Penal Code unless otherwise indicated.

state adequate reasons for its sentencing choices; and (5) the prosecution failed to specifically perform a negotiated disposition.

## FACTS

### *The Guilt Phase*

On December 16, 1985, at about 9:30 a.m., Belinda B. heard someone knocking at her front door. She got out of bed, put on a robe, and went to the door. She saw James through the window and asked him what he wanted. James replied that he was from UPS (United Parcel Service). When Belinda opened the door slightly, James forced the door open, knocking her to the floor. James grabbed her from behind and held her with a choke hold. Belinda offered him money, but James refused and forced her into the bedroom. James placed Belinda on the bed, pulled her robe over her head, and began to fondle her vagina. James penetrated Belinda's vagina with his finger. He then forced her to kneel and rubbed his penis against her vagina. Although he did not have a complete erection, he achieved partial penetration.

Mary P., Belinda's grandmother, entered the bedroom, saw what was happening and began to scream. James shoved Mrs. P. into another bedroom and bound her wrists and ankles with plastic tubing. Belinda saw that James had a knife. She did not try to escape because she feared for her life and her grandmother's life.

James returned to Belinda's bedroom and again raped her. Belinda felt something in his hand, but could not tell whether it was a knife. James then placed Belinda face down on the bed and bound her hands and feet. James demanded that Belinda tell him where her purse was. He located the purse, dumped out the contents, and took her keys and money. He had Belinda identify her car keys. He then left, after threatening to harm Belinda if she reported the matter. Belinda managed to free herself and called the police. Belinda discovered that her car was missing.

Officer Lee Schultz learned that James, who matched the suspect's description, had been released from jail that morning. Officers went to James's house and told James that they wanted to question him about the crimes; James attempted to flee. The officers apprehended him and took him to the station. When questioned, James admitted he went to the victims' house to steal a car and then decided to take their money. James stated that he raped Belinda "as an afterthought." James led the officers to Belinda's car.

### *The Sanity Phase*

*Defense Evidence.* Just after midnight on December 16, 1985, Deputy Sheriff Russell Predmore arrested James for prowling and possession of

burglary tools. Predmore described James's demeanor as "agitated and aberrant" and "very disoriented." James's behavior was consistent with methamphetamine use or prior involvement in an auto accident. James's pickup truck was found overturned about 300 feet down a canyon about three miles from where Predmore arrested James.

John Macdonald, a psychotherapist, examined James after his arrest for the burglary, robberies, and rape. James appeared nervous, agitated and suspicious and insisted that people were following him. Macdonald referred James to a psychiatrist for further examination and reevaluation of his prescribed medication.

Dr. J. M. Robison, Jr., a psychiatrist, examined James for five to ten minutes on December 27, 1985. James appeared quiet, not hostile or anxious, but stated that people were following him. James admitted use of methamphetamine. Dr. Robison tentatively diagnosed James as suffering from amphetamine organic withdrawal state.

Dr. Michael Kania, a clinical psychologist, examined James on February 12, 1986, for about an hour and a half. Dr. Kania also administered psychological tests, reviewed the police reports, and interviewed James's wife. Dr. Kania diagnosed James as suffering from an organic delusional disorder due to long term amphetamine abuse. Dr. Kania stated his opinion that at the time of the crimes, James was desperate due to delusions and could not distinguish right from wrong.

James's wife testified that they had been married about five years and had a good relationship until October 1985. His wife then noticed a marked change in James's behavior. Numerous times between October and December 1985, James claimed that people were following him to kill him. His appetite became poor and he did not sleep well. When his wife visited James in jail after his arrest, James admitted he had been using drugs. His wife found a syringe and a small packet of drugs among James's belongings. A toxicologist tested the drugs and the syringe and determined that they contained methamphetamine.

*Prosecution Evidence.* Belinda recounted the circumstances of the crimes. In her opinion, James did not act "crazy."

Officer Vernall Townsend testified about James's arrest. Townsend found James in the backyard of a neighbor's house. James acknowledged his identity. When Townsend told James that the police wanted to question him, James tried to flee.

On the evening of James's arrest, Officer Howard Harden accompanied him to the hospital to gather evidence. James attempted to flee as they left the hospital. Harden chased James and prevented the escape.

Dr. William Soltz, a psychologist, examined James for about an hour and a half on March 12, 1986, after reviewing the police reports and James's tape-recorded confession. Dr. Soltz determined that James had exhibited antisocial behavior since childhood and began using amphetamines at age 15. Dr. Soltz concluded that James probably had been delusional, but the crimes were not motivated by the delusions. In his opinion, James understood what he was doing and knew it was wrong.

Dr. Sayed Hamed, a psychiatrist, examined James on March 26 and April 14, 1986. Dr. Hamed observed that James's activities at the time he committed the crimes were "[g]oal-directed behavior from A to Z . . . [which] demonstrates criminal sophistication," and concluded that James "knew very well the nature and quality of his act, and he knew the difference between right and wrong." Dr. Hamed disagreed with the diagnosis that James suffered from organic delusional syndrome.

## DISCUSSION

### I

*Sufficiency of Evidence to Support Weapon Use Finding*

■ James contends that the evidence is insufficient to sustain the court's finding that he used a knife in committing the robbery charged in count 7.[2] ■ When the defendant attacks the sufficiency of the evidence to support a conviction, the court must examine the whole record in the light most favorable to the judgment below and presume in support of the judgment the existence of every fact the trier of fact could reasonably deduce from the evidence. (*People* v. *Johnson* (1980) 26 Cal.3d 557, 576 [162 Cal.Rptr. 431, 606 P.2d 738, 16 A.L.R.4th 1255].)

---

[2] The victim of count 7, Mary P., testified that James shoved her down on the bed, bound her wrists and ankles, and took over $300 in cash from her purse. Mrs. P. was never questioned about the use of a weapon. Belinda B. testified that her grandmother came into the bedroom about five minutes after James dragged Belinda into the bedroom. James got up and shoved Mrs. P. into her own bedroom. Belinda turned around, but could only see James's back. However, she did see a knife, which she described as "brown—I'm pretty sure it was a brown knife with metal on each end. And it had about a three-, three-and-a-half-inch blade. And it was a pocket knife." After James returned, Belinda felt something in James's hand during the second rape, but was not sure if it was the knife. Belinda testified that James never threatened her with the knife. The knife was not offered in evidence. James argues that Belinda's description of the weapon was insufficient to support the finding that James used the weapon in the robbery against Mrs. P.

The weapon use provision of former section 12022, subdivision (b) is substantally similar to the firearm use provision of section 12022.5.[3] Therefore, we rely on cases which construe the term "use" in section 12022.5. In *People* v. *Jacobs* (1987) 193 Cal.App.3d 375 [238 Cal.Rptr. 278], this court noted that cases in which a finding of firearm use was upheld fall into two categories. In the first category, the defendant aimed the gun at the victim, intentionally fired the gun, or used it to strike the victim. In the second category, the defendant held the gun or exposed it in a menacing fashion accompanied by words threatening violent use. (*Jacobs, supra,* 193 Cal.App.3d at p. 381, citing with approval *People* v. *Hays* (1983) 147 Cal.App.3d 534 [195 Cal.Rptr. 252]; compare CALJIC No. 17.16 (1977 rev.).)[4] In *Hays,* the court held that mere passive display of a weapon was not sufficient to support a finding of weapon use within the meaning of section 12022.5. (*Id.,* at pp. 548-549.)

In this case, no evidence would support a finding of weapon use under the first category; thus, the court's finding would have to come within the second category to be affirmed on appeal. However, there was no evidence that James made any threats which produced fear in Mrs. P.; Mrs. P. did not testify about the knife at all. Moreover, this court held in *Jacobs* that for weapon use to be found within the second category, the victim must be made aware of the weapon's presence. (*Jacobs, supra,* 193 Cal.App.3d at p. 381.) Again, there is simply no evidence that Mrs. P. was aware of the knife. Thus, we must reverse the finding of use of a knife in count 7, the robbery of Mrs. P.

II

*Qualifications of Expert Witness*

John Macdonald, a psychotherapist who testified as a defense witness at James's sanity trial, interviewed James shortly after his arrest. The prosecutor objected to any testimony that Macdonald had reached a diagnostic impression that James showed signs of acute paranoid disorder. A hearing was held outside the presence of the jury. The trial court ruled that the foundation was insufficient for Macdonald to testify about his diagnostic impression, and the prejudicial effect of his testimony would outweigh its

---

[3]Former section 12022, subdivision (b) called for an additional prison term for "Any person who personally uses a deadly or dangerous weapon in the commission . . . of a felony . . ." Section 12022.5 calls for an additional prison term for "[a]ny person who personally uses a firearm in the commission . . . of a felony . . ."

[4]CALJIC No. 17.16 (1977 rev.) provides that the term " 'used a deadly or dangerous weapon,' . . . means to display such a weapon in a[n intentionally] menacing manner or intentionally to strike or hit a human being with it."

probative value. ■ James argues that the trial court abused its discretion because it excluded Macdonald's diagnostic impression on the ground that Macdonald was not a psychiatrist or psychologist.

■ The trial court has considerable latitude in determining whether a witness qualifies as an expert, and its ruling will not be disturbed absent a showing of a manifest abuse of discretion. (*People* v. *Bloyd* (1987) 43 Cal.3d 333, 357 [233 Cal.Rptr. 368, 729 P.2d 802].) "The determinative test as to whether the trial court properly exercised its discretion is whether the witness has disclosed sufficient knowledge of the subject to entitle his opinion to go to the jury." (*Chadock* v. *Cohn* (1979) 96 Cal.App.3d 205, 209 [157 Cal.Rptr. 640].) The degree of the witness's knowledge goes to the weight of the evidence, not to its admissibility. (*Ibid.*)

■ A witness need not be a licensed physician to give a medical opinion. "Because of the dramatic growth of diverse interdisciplinary studies in recent times, often individuals of different nonphysician professions are called upon to give medical opinions or at least opinions involving some medical expertise." (*People* v. *Villareal* (1985) 173 Cal.App.3d 1136, 1142 [219 Cal.Rptr. 371].) Likewise, a person with adequate education and experience in psychology may qualify to give an opinion on matters relating to a defendant's sanity. (*People* v. *Davis* (1965) 62 Cal.2d 791, 799-801 [44 Cal.Rptr. 454, 402 P.2d 142].)

■ In this case, however, the court observed that Macdonald had spent less than half an hour with James; Macdonald testified that he normally spent two hours with a patient to make an accurate diagnostic impression. The trial court must determine whether in a particular case the expert spent sufficient time with the defendant to provide the basis for a meaningful opinion. (*People* v. *Coleman* (1969) 71 Cal.2d 1159, 1167 [80 Cal.Rptr. 920, 459 P.2d 248].) Here the trial court resolved that issue adversely to James. Accordingly, we conclude that the trial court did not abuse its discretion in refusing to allow Macdonald to testify as to his diagnostic impression.

## III

### *Flight Instruction*

■ Over James's objection, the trial court gave the jury a modified version of the flight instruction at James's sanity trial.[5] James now argues

---

[5] The court instructed the jury, "The flight of a person immediately after the commission of a crime, or after he is accused of a crime, is not sufficient in itself to establish his state of mind

that the instruction was improper and prejudicially misleading. Section 1127c did not mandate giving the flight instruction; the statute requires that instruction only during the guilt phase. (*People* v. *Tahl* (1967) 65 Cal.2d 719, 738 [56 Cal.Rptr. 318, 423 P.2d 246].)

James concedes that evidence of flight is relevant to the defendant's state of mind and consciousness of guilt. Dr. Soltz testified that James likely knew his acts were wrong because "He tried to evade arrest. He tried to run away. He tried to hide the money. He tried to secure the victims. . . . All of this suggests that he knew it was wrong."

However, James asserts that use of the flight instruction in the sanity phase erroneously suggests that the defendant need only distinguish *legal* right from wrong. In *People* v. *Skinner* (1985) 39 Cal.3d 765, 783 [217 Cal.Rptr. 685, 704 P.2d 752] the California Supreme Court held that "a defendant who is incapable of understanding that his act is morally wrong is not criminally liable merely because he knows the act is unlawful." The court noted that its "cases repeatedly distinguish awareness that an act is 'wrong' from knowledge of its legal effect, i.e., that it is unlawful." (*Id.,* at p. 780.)

However, we disagree with James's position that the instruction improperly permitted the jury to find James sane based solely on an ability to discern that his conduct was unlawful rather than morally wrong. The instruction merely indicated that flight was a factor which the jury could consider in determining the defendant's sanity.

Finally, if the instruction was misleading, nonetheless, any error was harmless. As noted above, one of the expert witnesses based his opinion that the James knew his acts were wrong on James's flight, in part. The jury was entitled to reach the same conclusion on the basis of the expert testimony regardless of whether the flight instruction was given. Moreover, we determine that the jury was adequately instructed on the standards for determining sanity, and it is not reasonably probable that the jury would have reached a more favorable result even if the instruction had been omitted. (*People* v. *Saddler* (1979) 24 Cal.3d 671, 683 [156 Cal.Rptr. 871, 597 P.2d 130].)

but is a fact which, if proved, may be considered by you in the light of all other proved facts in deciding the question of his sanity or insanity. The weight to which such circumstance is entitled is a matter for the jury to determine."

# IV

## *Sentencing Error*

■ James contends that the court failed to state reasons for imposing full consecutive terms under section 667.6, subdivision (c).[6] (*People v. Belmontes* (1983) 34 Cal.3d 335, 348 [193 Cal.Rptr. 882, 667 P.2d 686].)

In *Belmontes,* the California Supreme Court stated, "A decision to sentence under section 667.6, subdivision (c) is an additional sentence choice which requires a statement of reasons separate from those justifying the decision merely to sentence consecutively." (34 Cal.3d at p. 347.) That court explained, "This does not mean that the reasons justifying full term consecutive sentencing under section 667.6, subdivision (c) must necessarily be different than those used to justify the imposition of consecutive sentences under section 1170.1. The criteria listed in rule 425 . . . apply to both decisions and cover all degrees and nuances of depravity. What is required is an identification of the criteria which justify use of the drastically harsher provisions of section 667.6, subdivision (c). The crucial factor, in our view, is that the record reflect recognition on the part of the trial court that it is making a separate and additional choice in sentencing under section 667.6, subdivision (c).

---

[6] At the sentencing hearing the court stated: "Pursuant to rule 421 of the Rules of Court, the factors that I take into consideration in regards to aggravation and mitigation, are, one, the great threat of bodily harm to other persons; second, high degree of cruelty; third, viciousness and callousness involved exhibited by the defendant; fourth, armed with a knife; fifth, victim particularly vulnerable in this situation.

"The stealth used to enter the home under the guise of UPS, I believe, delivery man, shows planning and sophistication. We had, obviously, multiple victims. We had the robbery of not only the woman, but her grandmother, with the use of at least a knife found by the . . . Court—if not other weapons as well; and lastly, the prior convictions are numerous and obviously increasing.

"Mitigation. We have the voluntariness, acknowledging of wrongdoing at an early stage. However, the aggravating factors far outweigh any mitigating factors in this case.

"The Court intends to impose the aggravated term as to each count.

"As to criteria affecting current or consecutive sentencing under rule 425, the Court does find that the crimes involved separate acts of violence, separate victims. This is mainly—and I might also indicate that on the multiple rape of the victim, the two rape counts, forcible rape counts, . . . we had a total break in the sequence of events.

"We had the defendant, if I recall the testimony, coming to the door indicating he was a UPS individual; testimony by the actual victim at the NGI trial indicating he immediately entered, grabbed her by the neck, dragged her back to the bedroom, started the rape, interrupted the rape, went in to rob the grandmother, tied her up, returned, and then again raped the victim; a total break in sequence, a total separate violent crime on another person; and then returning back to the first victim, which, again, is a complete break in separate crime. And I so find." Finally, the court stated that it was sentencing to full consecutive terms under section 667.6, subdivision (c).

"The ideal method of proceeding would be for the trial court first to decide generally between concurrent and consecutive terms, following the criteria listed in rule 425. Once the court has decided to sentence a defendant to consecutive terms and has stated its reasons therefor, it then must decide whether the consecutive terms should be under the principal/subordinate scheme of section 1170.1 or under the full and separate term scheme of section 667.6, subdivision (c). *If the latter is chosen, the reasons therefor should be stated for the record.*" (*Id.,* at p. 348, italics added, fn. omitted.)

Here, the trial court recognized that it was making a separate and additional choice when it stated that it was sentencing under section 667.6, subdivision (c). Nonetheless, as in *Belmontes,* the trial court did not state why it chose the punitive provisions of section 667.6, subdivision (c). ▌ ▌▌▌▌ Thus, we must remand the matter for resentencing. (*Belmontes, supra,* 34 Cal.3d at pp. 348-349.)[7]

V

### *Terms of Negotiated Disposition*

▌ James contends he was entitled to specific performance of a negotiated disposition which called for a sentence of no more than 15 years and 4

---

[7] James requested remand to a different judge for resentencing on the ground that the trial judge in this case expressed a desire to sentence James to the maximum term consistent with the negotiated disposition. (*People* v. *Swanson* (1983) 140 Cal.App.3d 571, 574-575 [189 Cal.Rptr. 547].) In *Swanson,* the court directed that to avoid the appearance of unfairness, the case should be remanded for resentencing to a different judge because the record raised "the distinct possibility the judge based his sentence choice on his subjective belief about the length of sentence he wanted to impose." However, in this case, we are confident that the trial court will resentence James based solely on the proper criteria; we remand the matter to the same court.

Although we remand for resentencing on the ground that the trial court did not set forth its reasons for imposing full consecutive sentences, for the trial court's guidance on remand, we briefly discuss other sentencing issues which may recur.

*Dual Use of Facts.* The same fact may not be used both to impose the upper term and to justify consecutive sentences or to support an enhancement. (§ 1170, subd. (b); Cal. Rules of Court, rule 441(c); *People* v. *Enriquez* (1984) 159 Cal.App.3d 1, 5 [205 Cal.Rptr. 238].)

*Relation of Facts to Specific Counts.* Rule 421(a) speaks of "[f]acts relating to the *crime.*" (Italics added.) A factor in aggravation must relate to the specific crime to be aggravated. (*People* v. *Bejarano* (1981) 114 Cal.App.3d 693, 705 [173 Cal.Rptr. 71].) The sentencing court may use the same aggravating fact to impose more than one aggravated term "provided the fact is reasonably related to the particular count" and is not used to impose either an enhancement or a consecutive term. (*People* v. *Price* (1984) 151 Cal.App.3d 803, 812 [199 Cal.Rptr. 99].) However, the sentencing court "must carefully scrutinize each such crime-related fact to assure itself of its relevancy to a particular count. Further, the trial court must state reasons for each aggravated term in sufficient detail to permit meaningful appellate review."

months. Defense counsel agreed that the case would be submitted on the transcript "pursuant to the discussions we had with the Court and Judge Allen." The trial court, Judge Lloyd, advised James of his rights, took his waivers, and informed him that he could receive a maximum of 26 years and 4 months if found guilty of all charges. James stated that he understood. The trial court asked, "Has anyone in any way promised you anything other than what we've said on the record so far or that you know of so far to get you to submit on the transcript here today your guilt or innocence?" James replied, "No."

At a later hearing, defense counsel announced that he and Deputy District Attorney Stull, in discussions with Judge Allen, had agreed that James would be sentenced to no more than an aggregate of 20 years and 4 months, to consist of no more than 10 years and 4 months for the principal terms, enhanced by 10 years for the 2 prior felony convictions. Deputy District Attorney Moore, who had replaced Stull, stated that he was unaware of this disposition, but agreed to be bound by any agreement Stull had made. The trial court indicated that it did not remember this. The trial court later struck one of the prior felony convictions.

Another discussion about the negotiated disposition took place after the jury trial on sanity. Defense counsel reiterated his position that an agreement had been reached not only for a maximum limit of 20 years and 4 months, but also for internal limits on the aggregate parts of the sentence. James was to receive an eight-year upper term enhanced by one year for knife use and one year and four months consecutive for auto theft. This sentence was to be enhanced by the serious prior felony convictions. Because the court struck one of those convictions, the maximum limit for the sentence thus became 15 years and 4 months. The prosecutor disagreed that any internal limits had been part of the agreement. The trial judge asked the parties to contact Judge Allen and to attempt to resolve the dispute, and continued the matter for a hearing.

At the hearing, Stull stated that he recalled discussing only a maximum sentence with Judge Allen. The trial court contacted Judge Allen and confirmed that Judge Allen remembered an agreement only as to a 20-year, 4-month lid on the sentence. The trial court, after hearing arguments of counsel, concluded that a binding agreement had been reached between the People and the defense calling for a maximum sentence of 20 years, 4 months.

The trial judge's decision will not be disturbed in the absence of a clear showing of abuse of discretion. (*People* v. *Hernandez* (1979) 96 Cal.App.3d 856, 864 [158 Cal.Rptr. 434].) We find no abuse of discretion; the evidence

at the hearing on James's motion indicated that the only agreement reached was for a maximum sentence.

Furthermore, the trial court should not even have conducted a hearing on the matter. In *People* v. *West* (1970) 3 Cal.3d 595, 610 [91 Cal.Rptr. 385, 477 P.2d 409], the Supreme Court held that ". . . in every case in which a plea bargain is accepted, it should be recorded." The court set forth several alternatives for how the record could be created and explained, "The recordation of the plea bargain will afford to the appellate court, if such bargain is later collaterally or directly questioned, a complete account of the proceedings." (*Ibid.*) The purpose for the requirement was to avoid the costly and time-consuming practice of holding evidentiary hearings to reconstruct off-the-record agreements. (*Id.,* at p. 611.)[8]

Appellate courts should not indulge parties who involve themselves in informal plea negotiations and later attempt to enforce a plea bargain or negotiated disposition which has not been recorded. In virtually every criminal case, informal discussions take place off the record about a plea and the consequences of a plea in terms of sentencing. Only when the trial judge approves the elements of an agreement for disposition does such an agreement become enforceable.[9]

### DISPOSITION

The judgments of conviction are affirmed; however, the finding of weapon use under section 12022, subdivision (a) is reversed. The cause is remanded for resentencing in consideration of the views expressed in this opinion.

McDaniel, Acting P. J., and Hollenhorst, J., concurred.

Appellant's petition for review by the Supreme Court was denied June 7, 1989.

---

[8] We disagree with the holding of *Martinez* v. *Superior Court* (1973) 36 Cal.App.3d 683 [111 Cal.Rptr. 678], that a trial court should conduct an evidentiary hearing to determine if a negotiated agreement was made. This ruling is inconsistent with the mandate of the California Supreme Court in *People* v. *West, supra.*

[9] The court's approval of an agreement need not be given in open court. We recognize that certain circumstances require that the discussions resulting in an agreement take place in chambers. What is required, however, is that the record (which may be sealed if necessary until the actual plea is entered or until further order of the court) be made of the terms of the disposition and the court's approval of those terms.