[No. C065896. Third Dist. Jan. 25, 2012.]

THE PEOPLE, Plaintiff and Respondent, v.
SANDOR TORRES THIESSEN et al., Defendants and Appellants.

**[CERTIFIED FOR PARTIAL PUBLICATION*]**

---

*Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, the opinion is certified for publication with the exception of parts I through IV and part VI.

---

---

**COUNSEL**

A. M. Weisman for Defendant and Appellant Sandor Torres Thiessen.

Julie Schumer for Defendant and Appellant Juan Jose Ramirez.

S. Lynne Klein for Defendant and Appellant Marvin Orantes.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Charles A. French and Daniel B. Bernstein, Deputy Attorneys General, for Plaintiff and Respondent.

---

**OPINION**

**DUARTE, J.**—Two juries convicted three defendants based on an incident where driveby shooters wounded both their target, Joseph ("Mexicuz") Fresquez, and a bystander, Jamila Williams. One jury convicted Sandor Torres ("Loco") Thiessen of two counts of attempted premeditated murder and two counts of shooting from an occupied vehicle, and found true firearm enhancements appended to each count. (Pen. Code, §§ 664, 187, subd. (a); former § 12034, subd. (c); § 12022.53, subd. (b).) Another jury convicted Juan Jose ("Puppet") Ramirez and Marvin ("Shorty") Orantes of one count of attempted premeditated murder and two counts of shooting from a vehicle, but deadlocked on firearm enhancements against Ramirez. The trial court sentenced Thiessen to prison for 14 years to life plus 20 years and sentenced Ramirez and Orantes to prison for seven years to life plus five years. Defendants appealed.

On appeal, Thiessen contends the trial court erred in denying his motion to exclude his inculpatory statements which he argues were involuntary. We disagree. Thiessen also contends no substantial evidence supports the finding that he personally used a firearm. We address this contention in the published portion of our opinion.

All defendants contend that (1) the trial court should have granted a mistrial based on trial references to gangs; (2) the trial court misinstructed the jury that an aider is "equally guilty" with a perpetrator; and (3) references to the "kill zone" murder theory were prejudicial. As we will explain in the unpublished portion of our opinion, we disagree and shall reject each of these contentions.

Defendants further contend that the trial court's sentences as to each defendant must be modified to reflect life terms, rather than seven (or 14) years to life. We agree and shall modify the sentences, and otherwise affirm the judgments.

## FACTUAL AND PROCEDURAL BACKGROUND

All of the following evidence was heard by both juries, except for the evidence about Thiessen's inculpatory statements, which was heard only by Thiessen's jury.

Jamila Williams testified she was shot about 9:00 p.m. on August 26, 2009. She was visiting an apartment complex on 43rd Avenue near Martin Luther King Boulevard, and was on the sidewalk standing near two people, "Dakota" and "Mexicuz" (Fresquez). A four-door silver car drove by. Fresquez told Dakota, " 'There they go,' " and as Williams looked up, the car stopped, shots were fired, and people scattered. Williams ran after the first of two shots she heard, but was felled and saw her "leg blown wide open."[1] Fresquez was also felled. Williams admitted telling the police she thought the driver looked like "Shorty," but testified she had been referring to a woman.

Carla Basurto, who did not want to testify, testified she had two children by defendant Ramirez, known as "Puppet." Ramirez also had two children with Basurto's *mother*, Minda Arias, and stayed with Arias, who shared a duplex with Basurto. Basurto knew Orantes as "Shorty" and Thiessen as "Loco." On August 25, 2009, the day before the shooting, Basurto, Ramirez and friends got drunk to celebrate Basurto's birthday. Basurto passed out in the afternoon and did not know of a fight between Ramirez and Fresquez. She claimed not to remember much about the next day, but testified that when she spoke to detectives she had told the truth. At some point, Ramirez sent Basurto's brother Nathaniel and Orantes to get something, perhaps money, from Fresquez, possibly using her sister's silver car. After Nathaniel and Orantes returned, the men talked, Ramirez seemed "pissed off," and then left.

Basurto admitted telling the detectives that her brother Nathaniel was upset and afraid " 'that they were going to jump [Nathaniel] and he felt like

---

[1] A bullet broke Williams's right femur, and injuries on her left leg indicated she may have been shot twice, or was twice injured by one bullet.

[Orantes] didn't defend him.' " She denied seeing Thiessen at that point, but testified she saw him that night or "early morning of the next day" by a liquor store. She admitted she may have told the detectives she saw Ramirez, Orantes and Thiessen leave together, but testified, "that's not what I remember right now."

She told the detectives she saw a gun in a pillowcase, and that there were guns in a crawl space on Arias's side of the duplex, and there were two shotguns, but testified she had learned these were not real guns, but air guns or BB guns. She also denied knowing the difference between real and fake guns. She could not remember if she told detectives she saw Ramirez get a gun and put it in the trunk of a car on the night of the shooting. She later denied remembering telling them there were two brown shotguns and a black rifle. She did not recall saying that when the men left, Orantes was driving, Ramirez was in the front passenger seat, and Thiessen was in the back. She remembered saying they came back " 'like 20 minutes later' " and "It happened really quick.' " When Ramirez returned, he yelled to Basurto and Arias to get the kids, and two carloads of people left the duplex.

Fresquez testified he was a current state prisoner serving time for false imprisonment, and he had two prior convictions, for residential burglary and possession for sale of narcotics. He had sold Ramirez a vest that was supposed to be bulletproof, but lacked the armor plates that were designed to fit in it. Fresquez learned Ramirez wanted a refund, and went to Ramirez's duplex to discuss the matter the day before he got shot. When Fresquez arrived, "a whole bunch of people started beating me up." He could not remember who beat him, and claimed that when he spoke to detectives in the hospital, he was on drugs and therefore whatever he had told the police would not be reliable.

The next day, as Fresquez and his girlfriend were walking, Orantes "rode up on me" in a white or silver car. "He asked for the money. I told him to go to 43rd. And when they hit 43rd I had a whole bunch of friends out there, too. I guess they ran up to the car and they took off." There were three other people in that car, including "Chaparro," but Thiessen was not one of them. That evening, as Fresquez was standing outside an apartment with "Dakota," a car that looked like the car Orantes had driven earlier drove by, and Fresquez heard gunshots. He turned to run and was struck by a bullet.[2] Fresquez at first could not recall having told detectives that Orantes was still driving the car, but then confirmed he had done so, but he picked Orantes's photograph only because "it looked like a similar car that he was driving." He did not see Ramirez or Thiessen in the car. He had used methamphetamine that day.

---

[2] Fresquez sustained a gunshot wound to the abdomen that broke his pelvis.

Detective Brandon Luke testified he spoke with Fresquez at the hospital on September 8, 2009, and he seemed able to understand and respond to questions. Fresquez identified defendant Orantes as the driver of the car involved in the shooting, but could not identify anybody else in the car. Fresquez said that the day before, Ramirez, Orantes, Chaparro and Thiessen beat him up. On October 27, 2009, Luke spoke with Fresquez at the jail medical unit, and he identified a picture of Orantes as the driver.

On October 29, 2009, Luke spoke with Basurto, who came to the police station at his request. A video recording of her interview was played at trial.[3] Luke and Detective Robert Stewart participated in the interview. Basurto told them Ramirez was having a dispute with Arias, so he was staying with Basurto instead, and Orantes came with Ramirez to the house because "they're like partners." Ramirez sent Orantes and Basurto's brother Nathaniel to do something, "I think pick up money" from Fresquez, using her sister's silver car. When they came back, "my brother was upset that they were gonna jump him and he felt like [Orantes] didn't defend him, but I really don't know. [Ramirez] got all bent outta shape because he was very pissed off and then they left . . . ." By "they" she meant Orantes, Thiessen and Ramirez. Orantes was driving, Ramirez was in the front passenger seat, and Thiessen was in the back. According to Basurto, Ramirez retrieved a black rifle from under the duplex and placed it in the trunk.

About 20 or 30 minutes later Ramirez and Orantes returned, and Ramirez was crying and "screaming for me and [Arias] to grab our kids and run." With Orantes's help, they took the kids away from the house in two cars. Ramirez "was scared they were gonna come and retaliate" and hid in the house for about a week. Although Ramirez first denied shooting someone, he later told Basurto he had shot "the guy" and a "girl" while he was slouched down in the passenger seat. Ramirez told Basurto that Fresquez had disrespected Basurto's brother by trying to jump him.

The Thiessen jury heard testimony about Thiessen's interrogation and watched a video recording of it. Thiessen had been in jail, and when he was brought to the station house, he was allowed to see that Ramirez was also there. During the interview, the detectives implied that Ramirez and others had spoken to them about the shooting, and indicated they wanted to hear Thiessen's side of the story. At first he denied any involvement. He later admitted that he, Ramirez and Orantes "ass whooped" Fresquez over a vest on Basurto's birthday. When the detectives indicated they had searched a garage, Thiessen said, "Fuck. Alright. And you found the weapons." Thiessen

---

[3] The transcripts of the Basurto and Thiessen recordings were not admitted into evidence, but were provided in the clerk's transcript. However, the parties cite them freely, treating them as accurate transcriptions of the taped interviews, so we shall do the same.

also asked what the charges would be, how much time he would face, and whether he could still be released on January 13, 2010, his then current release date for the unrelated case that caused him to be in jail. Thiessen elaborated about the vest, stating that when someone was about to shoot Thiessen while he was wearing it, Thiessen realized it lacked the critical armor inserts. As a consequence, Thiessen, Ramirez and Orantes beat Fresquez up. Fresquez did not provide a refund, and later, with some friends, jumped Basurto's brother Nathaniel, who had been trying to resolve the dispute amicably. Then Thiessen, wielding a shotgun he claimed was inoperable, and Ramirez, wielding a rifle, got into a car that Orantes drove. When Fresquez was located, Ramirez fired two shots.

According to Thiessen, he pointed his shotgun at Fresquez through the same window Ramirez fired through and pulled the trigger, but his shotgun did not fire. The men then returned to Ramirez's house, which they evacuated for fear of retaliation.

Arias testified on behalf of Ramirez. Ramirez was her "children's father," and she was unhappy that Ramirez, who was "like my husband," was having a sexual relationship with her daughter. They argued about this relationship the entire day of the shooting, and Ramirez never left the residence except when they both went to a gas station. There was a BB gun that looked like a rifle at the house, but no real guns.

In argument, Orantes took the position there was no showing that Ramirez intended to kill anyone, no showing Orantes knew of Ramirez's purpose, and there remained a reasonable doubt about whether Orantes was the driver. Ramirez argued Basurto lied to the police, and there was insufficient evidence he had an intent to kill. Thiessen argued his inculpatory statements were not reliable due to intimidation, and the evidence indicated only two people were in the car, Ramirez and Orantes.

Thiessen's jury convicted him of two counts of attempted premeditated murder, and two counts of shooting from an occupied vehicle, and sustained firearm enhancements. The other jury convicted Ramirez and Orantes of two counts of shooting from a vehicle and the attempted premeditated murder count involving Fresquez, but acquitted both men of the attempted murder count involving Williams.

## DISCUSSION

### I–IV*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*See footnote, *ante*, page 1397.

## V

### *Firearm Use Enhancement*

Thiessen told the detectives he pointed a shotgun through the same window that Ramirez used to fire a rifle, and pulled the trigger so that the shotgun made a sound, to make "sure he knew, he heard the click. That way he can't say—oh you didn't even fuckin pull the trigger, you know what I mean?" On appeal, Thiessen contends this is not sufficient to show that he personally used the shotgun for purposes of the firearm enhancement because there was no evidence either victim *saw* the shotgun.

■ The relevant statute provides that any person who, in the commission of specified offenses or attempts, "personally uses a firearm," shall receive extra punishment, and provides that, "The firearm need not be operable or loaded for this enhancement to apply." (Pen. Code, § 12022.53, subd. (b).)[11]

■ In construing a similar statute, the California Supreme Court held: "Although the use of a firearm connotes something more than a bare potential for use, there need not be conduct which actually produces harm but only conduct which produces a fear of harm or force by means or display of a firearm in aiding the commission of one of the specified felonies. 'Use' means, among other things, 'to carry out a purpose or action by means of,' to 'make instrumental to an end or process,' and to 'apply to advantage.' [Citation.] The obvious legislative intent to deter the use of firearms in the commission of the specified felonies requires that 'uses' be broadly construed." (*People v. Chambers* (1972) 7 Cal.3d 666, 672 [102 Cal.Rptr. 776, 498 P.2d 1024] (*Chambers*).)

Even if the shotgun were inoperable and unseen by anyone else, as Thiessen claimed, by pointing it alongside Ramirez as Ramirez aimed a rifle at the intended victim, and pulling the trigger to make a "click" noise, Thiessen emboldened Ramirez to shoot. He therefore *used* the firearm to facilitate the commission of the crimes.

We agree with Thiessen that a firearm is *more commonly* used in other ways, viz. (1) by firing it, (2) by wielding it as a bludgeon, or (3) by displaying it to menace a victim. (See, e.g., *People v. Johnson* (1995) 38 Cal.App.4th 1315, 1319 [45 Cal.Rptr.2d 602].) We realize that some cases have stated or assumed that a weapon cannot "menace" a person who is

---

[11] This enhancement was designed to discourage criminal firearm use. (*People v. Palmer* (2005) 133 Cal.App.4th 1141, 1148–1149 [35 Cal.Rptr.3d 373] ["Section 12022.53, also known as the '10–20–life' law [citation], was enacted in 1997 . . ." to substantially increase penalties for using firearms to commit enumerated felonies.].)

unaware of its existence. (*People v. Jacobs* (1987) 193 Cal.App.3d 375, 381 [238 Cal.Rptr. 278] ["a firearm is displayed when, by sensory perception, the victim is made aware of its presence"]; accord, *People v. James* (1989) 208 Cal.App.3d 1155, 1163 [256 Cal.Rptr. 661] [victim did not see knife].)

■ But here, as we have explained, Thiessen used his firearm in a way that facilitated the crime, by showing his solidarity with Ramirez. We see no reason why such "use" does not satisfy both the terms and purpose of the statute. "Personal use of a firearm may be found where the defendant intentionally displayed a firearm in a menacing manner *in order to facilitate the commission of an underlying crime.*" (*People v. Carrasco* (2006) 137 Cal.App.4th 1050, 1059 [40 Cal.Rptr.3d 768], italics added.)

■ Further, more recent authority persuasively undermines defendant's view that a victim must perceive a firearm in order for it to support a use enhancement: "To excuse the defendant from this consequence merely because the victim lacked actual knowledge of the gun's deployment would limit the statute's deterrent effect for little if any discernible reason." (*People v. Granado* (1996) 49 Cal.App.4th 317, 327 [56 Cal.Rptr.2d 636] [construing Pen. Code, § 12022.5] (*Granado*).) "At its core the statute addresses the pervasive and inherent escalation of danger which arises from the *defendant's act* of deployment." (*Ibid.*)

Thiessen relies on a passage in *Chambers*, reiterated in later cases, as follows: "Although the use of a firearm connotes something more than a bare potential for use, there need not be conduct which actually produces harm but only conduct which produces a fear of harm or force by means or display of a firearm in aiding the commission of one of the specified felonies." (*Chambers, supra*, 7 Cal.3d at p. 672, quoted with approval in *People v. Bland* (1995) 10 Cal.4th 991, 997 [43 Cal.Rptr.2d 77, 898 P.2d 391].) Thiessen reads this to mean a display of a weapon must cause fear to qualify. However, that passage is not a *limitation* on the types of use that qualify, but an *expansion*: The passage indicates conduct which "actually produces harm" suffices, as does conduct which produces a fear of harm. By using his gun to embolden Ramirez, defendant used his gun in a way that helped actually produce harm. "Defendant's contrary interpretation is incompatible with the injunction in *Chambers* itself that the statute must 'be broadly construed.' " (*Granado, supra*, 49 Cal.App.4th at p. 327.)

■ Accordingly, we conclude substantial evidence supports the firearm use enhancement imposed on defendant Thiessen.[12]

---

[12] Federal law provides for increased penalties for a defined drug criminal who "uses or carries a firearm, or who, in furtherance of any such crime, possesses a firearm." (18 U.S.C.A. § 924(c)(1)(A).) This statute has been held to apply "if the possessor of a weapon intended to

## VI

### *Sentencing Error**

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## DISPOSITION

The judgments are affirmed as modified to reflect life sentences as to each defendant, consistent with this opinion. The trial court is directed to prepare and forward to the Department of Corrections and Rehabilitation certified abstracts of judgment reflecting these modifications.

Nicholson, Acting P. J., and Butz, J., concurred.

Appellants' petition for review by the Supreme Court was denied April 11, 2012, S200248.

---

have it available for possible use during or immediately following the transaction, *or if it facilitated the transaction by lending courage to the possessor.*" (*U.S. v. Payero* (1st Cir. 1989) 888 F.2d. 928, 929, italics added; see *U.S. v. Harmon* (10th Cir. 1993) 996 F.2d 256, 258 [use occurs when firearm "emboldens the defendant"].) While we recognize the definition in this federal statute is broader than "use" under California's "10–20–life" statute (see, e.g., *Smith v. United States* (1993) 508 U.S. 223 [124 L.Ed.2d 138, 113 S.Ct. 2050] [trading gun for drugs qualifies as use]), this reasoning bolsters our conclusion: Defendant pulled the trigger of the shotgun he was pointing, in line with the rifle Ramirez was pointing, in order to let Ramirez know he was doing so, and the jury could find this act emboldened Ramirez.

*See footnote, *ante*, page, 1397.