Filed 6/2/21

<u>CERTIFIED</u> <u>FOR</u> <u>PUBLICATION</u>

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>EDDIE RAY JONES, JR.,<br><br>    Defendant and Appellant. | C087494<br><br>(Super. Ct. No. 16FE019308) |

APPEAL from a judgment of the Superior Court of Sacramento County, Patrick Marlette, Judge. Affirmed.

Candace Hale, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Senior Assistant Attorney General, Julie A. Hokans and Clara M. Levers, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant Eddie Ray Jones, Jr., kidnapped a grandmother, F., and her two-year-old granddaughter, E., while carjacking F.'s car in a restaurant parking lot. Defendant approached F. with a handgun as she was putting E. into her car seat and told her, "don't do nothing stupid, just do whatever I say and nothing is going to happen to you or the baby." At defendant's direction, F. drove him to a few locations. Eventually, defendant took over driving, parked the car, and forced F. to orally copulate him. At the beginning of this ordeal, defendant took F.'s cell phone so she could not call the police. After the oral copulation, defendant drove to another location, where he took money from F. and then allowed her to leave on foot with her granddaughter as defendant drove away in her car.

Defendant was convicted by jury of two counts of kidnapping during a carjacking, two counts of robbery, and one count of forcible oral copulation. With respect to the latter crime, the jury found defendant kidnapped F. and the movement increased the risk of harm to her beyond that inherently present in the commission of the oral copulation. With respect to each count, the jury also found defendant personally used a firearm in the commission of the offense. The trial court sentenced defendant to serve an aggregate determinate prison term of 33 years plus a consecutive indeterminate term of 32 years to life.

On appeal, defendant contends: (1) the evidence is insufficient to support the enhancement for personal use of a firearm attached to the first robbery count, involving the taking of F.'s cell phone, because that robbery was complete before defendant displayed the gun in a menacing fashion; (2) the single larceny doctrine precludes defendant from being convicted of two robberies based on a single course of conduct;

(3) the trial court violated Penal Code[1] section 654 by imposing concurrent sentences for both robbery convictions; and (4) the abstract of judgment must be corrected.

We affirm. As we shall explain, there is sufficient evidence to support the challenged firearm enhancement. Defendant's two robbery convictions are not prohibited by the single larceny doctrine. Nor did the trial court violate section 654 by imposing concurrent sentences on these convictions. However, as the Attorney General concedes, the abstract of judgment must be corrected. We shall therefore direct the trial court to do so.

FACTS

On the afternoon of September 10, 2016, F. went to a restaurant in the Parkway neighborhood of Sacramento with her two-year-old granddaughter, E., where she picked up some food to bring back to her son's house. When she returned to her car, F. placed the food in the front passenger seat and then opened the back door on the passenger's side to place E. in her car seat. Before F. could put E. in her car seat, defendant approached holding a handgun in the front pocket of his hooded sweatshirt and said, "don't scream, don't do nothing stupid, just do whatever I say and nothing is going to happen to you or the baby." F. did not see the gun at this time, but during her testimony at trial, she demonstrated the gesture defendant made towards her with his hand in the pocket. The trial court later described the gesture as the "traditional, I have a gun in my pocket sign." F. also told two police officers, during separate interviews, that defendant announced he had a gun when he approached.[2]

---

[1]    Undesignated statutory references are to the Penal Code.

[2]    During her trial testimony, F. stated she did not remember defendant saying he had a gun. However, regardless of whether defendant announced the gun's presence, his actions caused F. to reasonably and correctly believe he had one.

3

When F. put her granddaughter in the car seat, defendant told her to "take the driver's side" and then buckled E. into the car seat himself. F. was afraid defendant would hurt both her and her granddaughter, so she got into the driver's seat as instructed. Defendant got into the front passenger's seat and told F. to give him her cell phone so she could not call the police. F. complied with this command as well. Defendant then told F. that she would be giving him a ride, after which he would let her go. Scared, but also somewhat relieved, F. started driving and followed the directions provided by defendant.

Defendant's directions took them to an apartment complex. He told F. where to park and then got out of the car, leaving the passenger door open. Defendant went to a nearby downstairs apartment, keeping his eyes on F. as he walked. F. considered pulling out of the parking space and driving away, but defendant could see her from where he stood in front of the apartment. She was afraid he would shoot her if she tried to leave. Eventually, the apartment door opened and someone inside handed defendant a plastic bag filled with a white substance. Defendant returned to the car, pulled a pipe out of his pocket, and smoked some of the substance before telling F. to continue driving.

Defendant then had F. drive him to a convenience store. He again left the passenger door open when he got out, telling F., "wait here, don't do nothing stupid." When defendant went inside the store, F. again considered driving away, but was too afraid to do so. He returned to the car in a couple minutes and told F. to continue driving.

With no announced destination, defendant directed F. to turn onto various streets in the surrounding neighborhoods. As she drove, defendant told her she was "beautiful for [her] age" and had a "nice body." He also tried to touch her leg, but she moved it away and tried to engage defendant in conversation. She told him that God loved him and that she had a son who was defendant's age, hoping this would cause defendant to let her go. Defendant eventually had F. pull into a driveway, where he briefly got out of the car and smoked some more of the white substance from the plastic bag. He then got back in the car and again told F. to drive. After more driving around, defendant had F. park in

4

a different driveway. In this driveway, defendant pulled out his cell phone and made a phone call. When defendant got off of the phone, F. asked him if he would let her go. Defendant responded, "not yet," and said he needed to wait for someone to call him back. He then had F. pull out of the driveway and park across the street, where defendant smoked more of the white substance.

About 20 minutes later, having not received the phone call he said he was waiting for, defendant told F. that he would be taking over the driving. It was at this point that F. first saw the gun. While defendant was still in the passenger seat, he pulled the gun out of his pants pocket and racked the slide, causing F. to believe he was about to shoot her. Defendant again told F. not to do anything stupid. They then changed seats and defendant placed the gun beneath his leg before driving away. After more driving around, defendant ended up parking the car near a middle school in the Valley Hi/North Laguna neighborhood. It was here that defendant pulled down his pants. F. started to pray and begged for defendant to let her and her granddaughter go. Defendant repeated that she needed to do what he said so that nothing happened to her or the baby. He then told her to "suck [his] dick." F. complied. When defendant ejaculated in her mouth, she spit some of the ejaculate onto her shirt.

After this act of forcible oral copulation, F. again asked to be allowed to leave. Defendant agreed, but not before he had already started to drive. They were near where F.'s son lived, so she asked to be let out at the next intersection. Defendant pulled over, but before he allowed F. to get out, he asked for her ID and all of her money. F. gave defendant her ID and over $200 in cash from her purse. Defendant looked closely at her ID and then gave it back to her, saying: "I know where you live." He also told her, "if somebody asks you [what happened,] I was a black man." F. got out of the car, removed both the car seat and her granddaughter from the back seat, and departed on foot as quickly as she could while defendant drove away.

5

The nature of the claims raised in this appeal do not require recitation of F.'s actions following her release from the car. It will suffice to note she notified the police and had a sexual assault examination performed. And while defendant does not challenge his identity as the perpetrator, we note F. identified him at trial. She also described certain distinctive tattoos defendant has on his face and hands. Most damaging, defendant's DNA profile was a match for the profile extracted from sperm cells found both on a swab taken from F.'s left breast and on the shirt she was wearing when the sexual assault occurred.

DISCUSSION

I

*Sufficiency of the Evidence*

Defendant contends the evidence is insufficient to support the enhancement for personal use of a firearm attached to the first robbery count, involving the taking of F.'s cell phone, because that robbery was complete before defendant displayed the gun in a menacing fashion. He is mistaken.

The standard for determining the sufficiency of the evidence to support an enhancement requires this court to view the evidence in the light most favorable to the judgment and determine whether any rational trier of fact could have found the elements of the enhancement beyond a reasonable doubt. (*People v. Alvarez* (1996) 14 Cal.4th 155, 224-225.)

Section 12022.53, subdivision (b) provides for "an additional and consecutive term of imprisonment in the state prison for 10 years" for "any person who, in the commission of [specified felony offenses], personally uses a firearm."

Interpreting a similar statute, section 12022.5, our Supreme Court explained: "Although the use of a firearm connotes something more than a bare potential for use, there need not be conduct which actually produces harm but only conduct which produces a fear of harm or force by means or display of a firearm in aiding the

6

commission of one of the specified felonies. 'Use' means, among other things, 'to carry out a purpose or action by means of,' to 'make instrumental to an end or process,' and to 'apply to advantage.' [Citation.] The obvious legislative intent to deter the use of firearms in the commission of the specified felonies requires that 'uses' be broadly construed." (*People v. Chambers* (1972) 7 Cal.3d 666, 672.)

We employ the same interpretation with respect to "uses a firearm" in section 12022.53. (See *People v. Thiessen* (2012) 202 Cal.App.4th 1397, 1404.) Thus, a defendant "uses a firearm" within the meaning of this section "where the defendant intentionally display[s] a firearm in a menacing manner in order to facilitate the commission of an underlying crime." (*People v. Carrasco* (2006) 137 Cal.App.4th 1050, 1059.)

The case law distinguishes such a facilitative use of a firearm from more passive conduct with the weapon that "appears to be purely incidental to the crime." (*People v. Granado* (1996) 49 Cal.App.4th 317, 324 (*Granado*).) An example of the latter incidental conduct occurred in *People v. Hays* (1983) 147 Cal.App.3d 534, where the defendant carried a rifle across his chest on a sling during a robbery, but did not otherwise use or threaten to use the weapon. The appellate court held this amounted to passive display of the weapon rather than "use." (*Id*. at pp. 548-549.) An example of facilitative use of a firearm occurred in *People v. Colligan* (1979) 91 Cal.App.3d 846, where the defendant showed the robbery victim the handle of the gun by opening his shirt and said he did not want to have to use it. This court held: "The clear implication of the remark that he didn't want to use it was that he would use it if [the victim] did not cooperate; it caused her to be frightened for her life and safety and to comply with his demands. It would be fatuous to conclude under these circumstances that the gun was not 'used' in the commission of the robbery." (*Id*. at p. 851.)

Here, defendant approached F. and her granddaughter holding a handgun in the front pocket of his hooded sweatshirt and said, "don't scream, don't do nothing stupid,

just do whatever I say and nothing is going to happen to you or the baby." While F. did not see the gun, defendant's gesturing with the gun in his pocket clearly indicated to F. that he had one. F. also told two police officers, during separate interviews, that defendant announced he had a gun when he approached. F. feared for her life and the life of her granddaughter and complied with defendant's demands. We conclude defendant used a firearm within the meaning of section 12022.53, subdivision (b).

Nevertheless, defendant argues the gun was not "displayed" because F. "did not see, hear, or feel the gun" when he took her cell phone. However, the enhancement does not require the victim to have seen, heard, or felt the gun itself. What the enhancement requires is a facilitative use of the gun, as explained above. Defendant is correct that the case law has defined such use to include menacing display of a firearm, and the appellate court in *People v. Jacobs* (1987) 193 Cal.App.3d 375 stated "a firearm is displayed when, by sensory perception, the victim is made aware of its presence." (*Id*. at p. 381.) That court went on to suggest that such a display is required in order for an accompanying "threat of use sufficient to produce fear of harm" to become "a use of that firearm." (*Ibid*.) There, the defendant told the victim he had a gun, said he did not want to use it, and then cocked the gun that was concealed inside his jacket. (*Id*. at p. 379.) Upholding the use enhancement, the court explained: "The victim was made aware of the gun by defendant's statements. These statements were corroborated in the victim's mind when he heard the sound of the hammer being cocked. We cannot say that this was insufficient evidence of displaying a firearm." (*Id*. at p. 382; see also *People v. Green* (1985) 166 Cal.App.3d 514, 517 [firearm use enhancement upheld where the victim did not see the gun, but felt it placed against her head, and two bullets were found in the defendant's pocket]; *People v. James* (1989) 208 Cal.App.3d 1155, 1163 [weapon use enhancement reversed where the victim was not "made aware of the weapon's presence"].)

While we fully agree with the conclusion that cocking a firearm, or otherwise making the victim sensorially aware of its presence, amounts to a display of the weapon,

8

we take issue with the suggestion in *Jacobs* that such a display is required.  Indeed, as our colleagues at the First Appellate District explained in *Granado*, what is required is not awareness of the weapon's presence on the part of the victim, but rather "facilitative, weapon-related conduct" on the part of the defendant.  (*Granado*, *supra*, 49 Cal.App.4th at p. 326.)  Describing section 12022.5, that court stated:  "At its core the statute addresses the pervasive and inherent escalation of danger which arises from the *defendant's act* of deployment.  By merely bringing a gun 'into play,' the defendant removes impediments to its actual discharge and thus enhances the danger of violent injury not only through an intentional act by the victim or a third party, but through an impulsive or inadvertent act by the defendant.  It requires no statistical study to know that a gun is far more likely to go off while held in the hand than while resting in a pocket, holster, or waistband."  (*Granado,* at p. 327.)  The court continued:  "We believe section 12022.5[ subdivision ](a) was intended in significant part to constrain a would-be robber in defendant's position to *keep the gun in his waistband*.  So long as he did so, he would be subject only to the enhancement for being armed.  But once he intentionally deployed the gun in furtherance of the offense, he became subject to a use enhancement.  To excuse the defendant from this consequence merely because the victim lacked actual knowledge of the gun's deployment would limit the statute's deterrent effect for little if any discernible reason."  (*Ibid*.)

Here, defendant employed the gun in his pocket in furtherance of the offenses of kidnapping and robbery by gesturing to F. with the gun in his pocket, telling her he had one, and further telling her to do what he said and nothing would happen to her or the baby, suggesting that disobeying would result in him using the gun to harm both of them.  We conclude defendant used a firearm during the commission of the first robbery within the meaning of section 12022.53, subdivision (b).

## II

### *Single Larceny Doctrine*

Defendant also claims the single larceny doctrine precludes him from being convicted of two robberies in this case because the robberies were part of a single course of conduct. We disagree.

The single larceny doctrine was cogently stated by our Supreme Court in *People v. Bailey* (1961) 55 Cal.2d 514: "Whether a series of wrongful acts constitutes a single offense or multiple offenses depends upon the facts of each case, and a defendant may be properly convicted upon separate counts charging grand theft from the same person if the evidence shows that the offenses are separate and distinct and were not committed pursuant to one intention, one general impulse, and one plan." (*Id.* at p. 519.) However, as the court clarified in *People v. Whitmer* (2014) 59 Cal.4th 733, "a defendant may be convicted of multiple counts of grand theft based on separate and distinct acts of theft, even if committed pursuant to a single overarching scheme." (*Id.* at p. 741.)

"Robbery occurs when any type of personal property is removed from the victim by force or fear with the intent to permanently deprive the victim of possession of the property." (*People v. Green* (1996) 50 Cal.App.4th 1076, 1083-1084 (*Green*).) The crime of robbery, therefore, "consists of larceny plus two aggravating circumstances." (*People v. Marquez* (2000) 78 Cal.App.4th 1302, 1308 (*Marquez*).)

In *People v. Ortega* (1998) 19 Cal.4th 686 (*Ortega*), overruled on another ground in *People v. Reed* (2006) 38 Cal.4th 1224, our Supreme Court applied the single larceny doctrine to preclude the defendant in that case from being convicted of both robbery and theft of one of the items, a vehicle, taken during the robbery. The court held that a defendant who steals multiple items during the course of an " 'indivisible transaction' " involving a single victim has " 'commit[ed] only one robbery or theft notwithstanding the number of items he steals.' [Citation.]" (*Ortega,* at p. 699.) Providing *People v. Irvin* (1991) 230 Cal.App.3d 180 as an example, the court explained "the defendant [in *Irvin*]

10

entered the victim's automobile by threatening her with a knife, demanded and received her money and purse, then ordered the victim to leave the automobile, and drove away in the vehicle. The Court of Appeal affirmed the defendant's conviction for robbery, but reversed his conviction for grand theft of an automobile, concluding that the robbery necessarily included the theft of the vehicle: 'We find no authority for the proposition that a robber may be charged with and convicted of a separate robbery, or an additional offense of grand theft, because he or she took more than one item from a solitary victim during a single course of conduct.' [Citations.]" (*Ortega*, at pp. 699-700; see also *Marquez, supra*, 78 Cal.App.4th at pp. 1307-1309 [single larceny doctrine precluded two robbery convictions where the defendant, in "one seamless ill-conceived effort," walked up to a restaurant counter and threatened a server with a handgun, causing her to hand over her tips and money from the cash drawer; while "two separately owned amounts of money" were involved, they were taken "at the same place and at the same time" in an "indivisible transaction"].)

However, the *Ortega* court also cited *Green, supra*, 50 Cal.App.4th 1076, as an example of a situation in which the single larceny doctrine would not apply. (*Ortega, supra*, 19 Cal.4th at p. 700.) In *Green*, the defendant and an accomplice approached the victim in a garage, placed a gun to her head, and robbed her of her purse. The defendant then, by himself, kidnapped the victim and drove her to a secluded area, where he sexually assaulted and attempted to rape her. "Only after these sexual offenses had been completed and [the defendant's] sexual objectives had been fulfilled did [he] take [the victim's] car by force." (*Green,* at p. 1085.) The appellate court held the defendant could be convicted of, and separately punished for, both the initial robbery of the purse and the subsequent carjacking, explaining: "Because the carjacking was thus separated in time and place from the initial robbery of [the victim's] purse and was interrupted by the sexual attack perpetrated by [the defendant], the record contains sufficient evidence to support the trial court's explicit finding the taking of the purse and the taking of the

11

vehicle were separate incidents which merited separate and additional punishment." (*Ibid*.)

This case is analogous to *Green*. Defendant took F.'s cell phone in the restaurant parking lot at the start of this kidnapping/carjacking so that she could not call the police. Then, after forcing her to drive him to several locations, defendant took over the driving, drove to another location, and forced her to orally copulate him. It was only after that criminal act that defendant drove her to yet another location, where he robbed her of money and finally allowed her to leave with her granddaughter. Unlike *Ortega*, *Irvin*, and *Marquez*, involving indivisible larcenous transactions, the initial taking of F.'s cell phone was separated in time and space from the subsequent taking of her money, and these distinct robberies were further separated by defendant's decision to force her to orally copulate him.

We conclude the single larceny doctrine does not apply on these facts. Defendant was properly convicted of two counts of robbery in this case.

### III

### *Section 654*

Defendant further asserts the trial court violated section 654 by imposing concurrent sentences for both robbery convictions. We are not persuaded.

Section 654 precludes multiple punishment for "a single act or indivisible course of conduct." (*People v. Assad* (2010) 189 Cal.App.4th 187, 200.) " 'The divisibility of a course of conduct depends upon the intent and objective of the defendant. . . . [I]f the evidence discloses that a defendant entertained multiple criminal objectives which were independent of and not merely incidental to each other, the trial court may impose punishment for independent violations committed in pursuit of each objective even though the violations shared common acts or were parts of an otherwise indivisible course of conduct.' [Citations.]" (*People v. Akins* (1997) 56 Cal.App.4th 331, 338-339.) Whether a defendant harbored multiple criminal objectives is a question of fact, the trial

12

court's determination of which must be upheld on appeal if supported by substantial evidence. (*People v. Nubla* (1999) 74 Cal.App.4th 719, 730.)

As previously stated, in *Green*, *supra*, 50 Cal.App.4th 1076, the court held section 654 did not preclude multiple punishment on the facts of that case. We also conclude that provision does not preclude multiple punishment here. Without unnecessarily repeating ourselves, we conclude the evidence is more than sufficient to support the trial court's implied finding that the two robberies were not part of an indivisible course of conduct. Moreover, even though defendant undoubtedly possessed the same intent, i.e., to permanently deprive F. of her property, when he took both her cell phone and her money, he had time between the robberies to reflect on his actions and renew his intent to steal. (See *People v. Trotter* (1992) 7 Cal.App.4th 363, 367-368 [§ 654 did not apply where the defendant had time to reflect between the shots he fired at a police officer and renewed his intent to harm the officer].)

The trial court did not violate section 654 by imposing concurrent sentences on defendant's robbery convictions.

## IV

### *Correction of the Abstract of Judgment*

Finally, as defendant points out, and the Attorney General concedes, the abstract of judgment must be corrected to reflect the oral pronouncement thereof. The trial court imposed a sentence of seven years to life on count one and stayed execution of that sentence pursuant to section 654. However, the abstract of judgment lists that sentence as a consecutive term of imprisonment. We shall order the appropriate correction of the abstract of judgment.

## DISPOSITION

The judgment is affirmed. The trial court is directed to correct the abstract of judgment to reflect the sentence imposed on count one was stayed pursuant to Penal Code

13

section 654 and to forward a certified copy of the corrected abstract to the Department of Corrections and Rehabilitation.

_/s/_____
HOCH, J.

We concur:

_/s/_____
MAURO, Acting P. J.

_/s/_____
DUARTE, J.