Filed 10/9/25  P. v. Chapman CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>MICHAEL JOHN CHAPMAN,<br><br>    Defendant and Appellant. | A171062<br><br>(Mendocino County Super. Ct.<br>No. 24CR03730) |

Defendant Michael Chapman was diagnosed with delusional and narcissistic personality disorder, and in late September 2023, was referred to a mental health facility where T.R. worked as a clinical analyst and case manager.  T.R. met Chapman early on, and whatever their interactions were over the first several months, they were uneventful.  Things changed in early 2024, when Chapman moved to an apartment across from the facility and T.R. was helpful to him, and one morning T.R. found a poster board taped to the facility door that had plastic roses attached to it and a heart that read "[T.R.] is a goddess!!!"  Chapman's conduct toward T.R. escalated—and met resistance from facility personnel.  But numerous voicemails from Chapman followed, with increasing intensity and vituperation, culminating in late February when Chapman appeared at the facility "angry and yelling," with black paint across his eyes, "meat claws" zip-tied to his wrists, and a ball-peen hammer hanging off his belt.  Chapman was later arrested.

1

Chapman was charged with two counts of stalking, the first of which included an enhancement for use of a dangerous or deadly weapon. A jury found Chapman guilty of that charge and found the enhancement true. Chapman appeals, arguing that there is no substantial evidence to support that enhancement, on three separate bases: (1) he did not display the meat claws in a menacing manner; (2) they do not constitute a dangerous weapon; and (3) he did not display them during the commission of a crime. We reject the arguments, and we affirm.

## BACKGROUND

### The General Setting

Chapman was diagnosed with delusional and narcissistic personality disorder, and in late 2023, was referred to the Mendocino Coast Hospitality Center in Fort Bragg (Center). One of the employees at the Center was T.R., a clinical analyst and case manager, who was often the first contact point for people scheduling appointments to determine eligibility for services. Chapman and T.R. met in September 2023 and whatever their early interactions, they were uneventful. In early 2024, Chapman moved into an apartment across from the Center, and staff of the Center, including T.R., assisted him, including telling Chapman he could store his mattress at the Center. And Chapman's conduct changed.

Early in the morning of January 30, Chapman left two voicemails for T.R. One referred to parking his truck at the Center for a few days, but also commented that the Center hired beautiful women. The second voicemail said this:

"Hello, . . . this message is for [T.R.] again, this is Michael Chapman, the Footlocker savage. Um, I wanted to, uh, say that . . . I've been told I have the serial killer gene. Which is kind of funny. . . but, uh, that doesn't mean

2

I'm a serial killer, but I must admit it's probably 100 [percent] true. . . [laugh] I've been known to eat. . . a lot of cereal. . . and. . . however, I thought I'm serious about the gene though. It's, uh, you may think, oh, man, this guy's a sicko, but, no, I just think about things, you know, don't necessarily do 'em, but hey, hey, hey. Have a good day."

On February 12, Chapman came to the Center and said he did not have ice trays; T.R. gave him some ice trays from the Center, and Chapman was appreciative. T.R. arrived at work the next morning to find a large poster attached to the Center door. The poster had a large heart drawn on it, inside of which were the words T.R. "is a goddess!!!" And a note under the heart said, "I love you," and plastic roses were attached to the poster.[1]

T.R. "just felt weird," and reported the incident to the Center's executive director Paul Davis. Davis told T.R. they had to treat it "sensitively . . . due to the people that we work with, the client base." T.R. was not happy with that response, but understood. Nevertheless, a part of her felt unsafe.

On February 15, T.R. arrived at work to find an envelope taped to the door, again in Chapman's handwriting. Inside was a card on which was a note, a handwritten letter on lined paper, and a shorter letter with a key to Chapman's apartment taped to it. The card was addressed to "My [T.R.] Macarina" and contained Elton John song lyrics and other statements. In the letter, Chapman wrote that "I AM Michael . . . and im [sic] so attracted to you, that I'm gonna burst, into flames. Understand this, if I like you and you like me, NOBODY can stop us!"; that he had been "head over heals" [sic] for T.R. since he first saw her; that if she was not interested, "it's ok!"; and that "No matter what, you are a beautiful soul and I want you all to myself and I

---

[1]     The note was signed "Jesus King," which Chapman had previously written on various documents.

will NEVER stop loving you!" The note with the key attached said, "im [*sic*] naked . . . lol, joking . . . but . . . lol. Let's cry about it, lol. [¶] Better just think about this sitting down . . . on my face . . . Ha!" Chapman described his apartment as T.R.'s "spare office," and said she could come over "ANY time."

T.R., a married woman, felt "scared, like harassed" and "taunted." She did not appreciate the sexual innuendos, was struck by Chapman's statement that he would always love her, and did not "understand where he was coming from."

T.R. showed the documents to Davis and also reported it to the clinical director. Davis wrote a letter to Chapman telling him to stop leaving notes and voicemails, and advising that he could pick up his key. Davis mailed the letter to Chapman's apartment, kept a copy and the key in his mailbox at the Center, and had a copy placed at the clinic reception area. Chapman did not retrieve the key.

Later on February 15, T.R. saw Chapman, shirtless and with his dog, walking back and forth in front of the Center, and then sit at a nearby cafe for some 45 minutes, which she described as "very taunting."[2] And from that point until February 23, T.R. saw Chapman outside the Center every day.[3]

Meanwhile, between February 20 and 23, Chapman left several voicemails on the main phone line, which Center employees forwarded to Davis, transcripts of which were provided to the jury. Suffice to say that these voicemails were darker and more threatening than earlier ones, and

---

[2]     At one point, Chapman tried to open the door from the sidewalk to the lobby, but T.R. had locked it.

[3]     During that time T.R. had her husband come to work with her, so she would not be alone; she also brought pepper spray and a baseball bat "just in case."

4

increasing in intensity.  The prosecutor read portions of those voicemails to the jury at some length, and we quote some portions of that reading.  Thus:

"And you have those, again for you to listen to should you so choose.  Just reading from a few lines of them:

"1, Mr. Chapman acknowledging that he's understanding as of today that [T.R.] is married.  And at the conclusion of his message he states:

" 'But if she ain't happily married, then I'll be glad to, uh, make her my bitch.'

"There's another message that he leaves immediately after that where he states:

" 'I don't like how the government tells me who I can and can't love.  I'm like, excuse me.  How do I—how about I put your head in a fucking vice grip and make you pop your fucking eye out?'

"There's another voice mail that comes in that states:

" 'If people hurt me, I just give it to God and God handles the situation.'

"A little further down in that voice mail:

" 'You mess with God's son and you get seven fold, so I don't do it, God does.  So the people that mess with me, mess with God.'

"Another voice mail that came in in that same time frame, a portion of that:

" 'Yeah, one day you're going to be living my fucking life and all that pain that you fucking just gave me, you're going to be eating it.' . . . [¶] . . . .

"Further:  'And it doesn't matter about laws or anything like that.  You just don't give a fuck.  That's why I'm impenetrable when it comes to laws and bull shit like that.  They could bring in an army against me, but it would not work.  As long as I'm on the right side because I'm on God's side you guys

understand?  So the sooner you get that, the sooner you can be unstoppable.' . . . [¶]. . . .

"Subsequent voice mail:  'And I don't think that I don't, I'm just very sad right now because I'm disappointed.  I do—I don't get mad.  I really just get disappointed.  And, you know, it's—I mean, I'm just very disappoint [*sic*] in [T.R.], okay?'

"And then he says, 'I wasn't trying to force myself on anybody.  You think I want to be—you think I want a married fucking gorilla looking bitch?  Fucking no.  Fucking, I looked at her as a beautiful woman, now I look at her as a dumb, fucking gorilla bitch.'

"There's a subsequent message, this is, again, all in that same time period leading up to the 23rd, that specifically says:  'This message is for anybody in charge or wants to listen to it Paul or anybody or Jessica or whoever wants to listen to it.'

"He says—and this, I think, goes to the pattern of threat conduct, specifically if you consider what he's saying in light of everything else that's been going on, that while he may be expressing what appears to be concern for the staff at Hospitality Center, what he's actually doing is relaying to them a threat.  And that verbiage is, in reference to a staff member.

" 'I do think she's being left high and dry with that front area right where you walk in.  It's kind of susceptible and I don't like the way it's set up.  It's very unsafe for her.  And, like, people at the front desk, I don't like it.  There's, like, a blind spot with that computer.  You can't really see what's going on.  So, like, if someone came in there and really wanted to fuck people up, they'd be fucked.'

6

"And he says further in that same voice mail: 'I don't have any complaints for the staff, besides [T.R.], I mean, I love her to pieces. But she's a little provocative and then tries to blame it on somebody else.'

"And then he says, 'I thought she really digged me. And I don't care—I don't care about rules. I don't give a fuck about rules. Like, I wasn't born to sit and follow man's rules. So sorry.' "

On the morning of February 23, Jessica Fitch, a vocational training specialist at the Center, prepared to open the Center for the day, when she saw Chapman approaching his truck that was parked directly in front of the Center. The Center staff had been instructed to return Chapman's apartment key to him. Fitch got the key and opened the door to give it to him, and as she did saw that Chapman's face was painted "and he had some weapons, like meat shredders and a hammer hanging from him which was not normal for him." Fitch went to hand Chapman the envelope with his key in it, and he said, " 'If I were you, I would have called in sick today.' " He then took the envelope.

Fitch closed the door to the Center and kept it locked. Fitch took Chapman's statement as a threat, and called Davis, who was working at home that day, and who advised her to call the police, which she did. Fitch also called T.R. and told her about Chapman's comment, to keep the clinic locked, and to come to the main part of the Center.

Officer David Franco of the Fort Bragg Police Department was dispatched to the Center, as staff had requested Chapman be "trespassed from the property," meaning that he be told he could not return to the Center, and if he did, he would be subject to arrest. Franco contacted Chapman and spoke with him outside his apartment. Chapman was angry and yelling; he was shirtless, with black paint across his eyes, which Franco described as

"war paint"; and he had meat claws zip-tied to each wrist and a ball-peen hammer hanging off of his belt.

Franco told Chapman he was trespassed from the property. Chapman said: " 'If anybody tries to stop me, we're going to have a big fucking problem.' " Chapman said he was going to protest outside the Center and that was why his truck was parked in front of it. Asked about the hammer and meat claws, Chapman said he had the hammer because he was a carpenter and the meat claws because he likes to cook. Franco, who was familiar with carpentry, knew that a ball-peen hammer was used for metal, not carpentry.

Franco left, and Chapman went back inside his apartment. Franco returned to the Center, where Captain Thomas O'Neal, who supervised the patrol division, had arrived on scene. O'Neal did not know it was a stalking investigation or that Chapman was "armed." O'Neal was also familiar with Chapman's truck, which he normally parked in the lot of his apartment complex. When O'Neal arrived on the scene, however, the truck was parked in a loading zone outside the Center with a dog inside. O'Neal called Chapman and left a voicemail telling him he needed to move the truck.

As O'Neal was walking around the truck to check on the dog, he saw Chapman approaching quickly, with the hammer and meat claws still zip-tied to him. O'Neal described the meat claws as hardened plastic claws used for shredding pork, and "they're sharp." O'Neal testified that in his 11 years as a law enforcement officer, he had never seen anyone with "weapons" zip-tied to them, and that a person would do that if they wanted to "prevent the opposing party from taking it from them. It's so you can't pull it from their body when you're fighting." It was also "uncommon" for a person to carry around a ball-peen hammer.

8

Chapman was also holding a three-foot tall poster that had an "I," a heart, and the letter "U," and next to the heart was an apostrophe and the letter "D"—in other words, the poster read, "I loved you."

Body-camera video of the exchange between Chapman and O'Neal was admitted into evidence, which revealed that Chapman said he had not gotten the message to move his truck as he had blocked O'Neal's phone number. O'Neal cautioned Chapman that the meat claw in his hand was "a felony," and Chapman replied he had the meat claws because he was cooking "a bunch of food for people" and the hammer because it was a carpentry tool and he was on his way to work. At some point, Chapman reached his fist back as though he was going to punch O'Neal, and O'Neal detained him.

Franco read appellant his *Miranda* rights and Chapman made a statement. Franco asked if Chapman was angry about the letter from Davis but he said no; he also said that the meat claws and hammer were for his protection while he was protesting, not repeating his earlier claim that they were for cooking and carpentry.

T.R. also saw Chapman with the hammer and meat claws. She was scared and believed Chapman intended to scare her with them. She also saw Chapman with the poster board that said "I love[d] you." At T.R.'s request, Franco obtained an emergency protective order.

On February 26, Center staff checked the outside mailbox, and found three notes from Chapman. One stated, "You are murderers! Drugs kill! You are a pimp!" Another stated in part, "Deny love to the son of God? Well, the price for that is losing all your love. . . . Say goodbye to all you love, 'kids' too!" And the third said: "It's denied love to the son of God. Well that's the price for—well, the price for that is losing all you love. Let the government tell you who to love, we will unfund the government, do you see? You can't

win or heal without love. Say goodbye to all you love, kids too. Was it worth it? Love the real Jesus, the Christ. Join me. Safe love." Davis found the notes vaguely threatening and took them to the police station.

**The Proceedings Below**

On April 30, the Mendocino County District Attorney's Office filed an information charging Chapman with two counts: stalking (Pen. Code[4], § 646.9, subd. (a); count 1), with an enhancement for personally using a deadly or dangerous weapon (§ 12022, subd. (b)(1)), and stalking in violation of a restraining order (§ 646.9, subd. (b); count 2), which further alleged that Chapman committed the offense while out of custody on bail (§ 12022.1).

Jury trial began in the afternoon of June 11, and testimony was taken over some two and a half days. On the morning of June 14, the court heard brief testimony, following which the court instructed the jury, and counsel gave their closing arguments. That afternoon the court gave its concluding instructions, and the case was in the hands of the jury. Later that afternoon, the jury reached its verdict: guilty of stalking on count 1, and finding true that he personally used a deadly or dangerous weapon; not guilty of stalking in violation of a restraining order.

On July 8, the court sentenced Chapman to an aggregate term of two years four months: 16 months, the mitigated term for stalking, and one year for the enhancement.

The next day, Chapman filed a notice of appeal.

## DISCUSSION

As indicated, Chapman was convicted of stalking, and the jury found true the section 12022, subdivision (b)(1) enhancement that he "personally use[d] a deadly or dangerous weapon in the commission of a felony." Not

---

4    Further undesignated statutory references are to the Penal Code.

10

challenging the conviction itself, Chapman attacks only the enhancement, doing so in a brief that sets forth a version of facts treating Chapman's actions in isolation, with no acknowledgement that he engaged over a period of weeks in a pattern of harassment that culminated on February 23, when he appeared with painted eyes, meat claws zip-tied to his wrists, and a ball-peen hammer hanging off his belt, and parked his truck directly in front of the Center where T.R. worked.

With such a brief, Chapman argues there is insufficient evidence to support the true finding, an argument that has three sub-parts, that there was insufficient evidence that: (1) he displayed the meat claws in a menacing manner; (2) the meat claws constitute a dangerous weapon; and (3) he "displayed the meat claws in a menacing manner *during the commission of the crime*."

**The Law of Substantial Evidence**

As the Supreme Court described in its most recent decision, just over a month ago: "In reviewing a sufficiency of evidence claim, the reviewing court's role is a limited one. ' "The proper test for determining a claim of insufficiency of evidence in a criminal case is whether, on the entire record, a rational trier of fact could find the defendant guilty beyond a reasonable doubt. [Citations.] On appeal, we must view the evidence in the light most favorable to the People and must presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." ' " (*People v. Smith* (2005) 37 Cal.4th 733, 738–739 (*Smith II*).) " ' " "Although we must ensure the evidence is reasonable, credible, and of solid value, nonetheless it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts on which that determination depends. [Citation.] Thus, if the verdict is

11

supported by substantial evidence, we must accord due deference to the trier of fact and not substitute our evaluation of a witness's credibility for that of the fact finder.' " ' (*Id.* at p. 739.)" (*People v. Alvarez* (2025) 18 Cal.5th 387, 470 (*Alvarez*); accord, *People v. Abillar* (2010) 51 Cal.4th 47, 60.)

The same rule applies where, as here, we are reviewing whether the evidence is sufficient to support an enhancement. (*People v. Wilson* (2008) 44 Cal.4th 758, 806.)

In sum and in short, we " ' " 'presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence,' " ' " (*Alvarez, supra,* 18 Cal.5th 387, 470 [p. 112]), and will not reverse "unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction].' " (*People v. Bolin* (1998) 18 Cal.4th 297, 331; *People v. Hughes* (2002) 27 Cal.4th 287, 370.)

Chapman has not demonstrated there is "no hypothesis whatever." There is substantial evidence to support the jury finding.

Section 12022, subdivision (b)(1) imposes additional punishment when a defendant "personally uses a deadly or dangerous weapon in the commission of a felony or attempted felony[.]" And as the CALCRIM instruction notes, the first way a defendant can "personally use" a deadly or dangerous weapon is if he "[d]isplays the weapon in a menacing manner." (CALCRIM No. 3145.) Chapman did that here.

Claiming that he did not, Chapman cites only *People v. Hays* (1983) 147 Cal.App.3d 534, which he describes as "instructive." We would describe it as "distinguishable." To begin with, *Hays* involved the crime of assault with a deadly weapon (§ 245, subd. (a)), not stalking. Moreover, the facts are markedly different, as there, in the course of committing a robbery, Hays crashed through a ceiling with a rifle strapped across his chest, but did not

12

touch it, point it at any victim, or threaten anyone with it. (*Id.* at p. 544.) The Court of Appeal held that passively displaying a firearm was insufficient to support a finding that the defendant personally used the firearm. (*Id.* at pp. 548–549.) That is not the situation here.

We ourselves discussed—and distinguished—*Hays*, in *People v. Granado* (1996) 49 Cal.App.4th 317, 324, where we observed that "[t]he holding in *Hays* reflects a principle under which a finding of weapon use is precluded if the defendant's conduct with respect to the weapon appears to be purely incidental to the crime. In *Hays* the evidence was insufficient because, even though the gun was exposed to the victim's view, the exposure was not an act in furtherance of the crime, but a mere incident of possession."

Whatever was said in 1996, various cases since hold that "use" is to be "broadly construed." *People v. Hajek and Vo* (2014) 58 Cal.4th 1144, 1198, disapproved on another ground in *People v. Rangel* (2016) 62 Cal.4th 1192, 1216 is instructive, where, affirming a jury finding true the use enhancement, the Court said this:

"In determining whether there was substantial evidence of Vo's knife use, we may properly consult cases construing the term 'uses' in other enhancement statutes under ' "The Dangerous Weapons' Control Law." ' (*People v. Masbruch* (1996) 13 Cal.4th 1001, 1006.) Hence, we may rely on cases construing the term as it is understood for purposes of section 12022.5, which addresses personal use of a firearm in the commission or attempted commission of a felony. (*People v. James* (1989) 208 Cal.App.3d 1155, 1163; see *People v. Wilson, supra*, 44 Cal.4th at pp. 806–807 [construing 'uses' in former § 12022.5, subd. (a)]; *People v. Granado* (1996) 49 Cal.App.4th 317, 325 (*Granado*) [same].) As we have recognized in the context of former section 12022.5, subdivision (a), ' "The obvious legislative intent to deter the

13

use of firearms in the commission of the specified felonies requires that 'uses' be broadly construed." [Citation.] "Thus when a defendant deliberately shows a gun, or otherwise makes its presence known, and there is no evidence to suggest any purpose other than intimidating the victim (or others) so as to successfully complete the underlying offense, the jury is entitled to find a facilitative use rather than an incidental or inadvertent exposure." ' (*People v. Wilson, supra,* 44 Cal.4th at pp. 806–807, quoting *Granado, supra,* 49 Cal.App.4th at p. 325.)" (*People v. Hajek and Vo, supra,* 58 Cal.4th at p. 1198.)[5]

Likewise here. A jury could reasonably find that Chapman's possession of the meat claws was not merely incidental.

Chapman had been "taunting" T.R. for days, without any weapons, by walking up and down the street in front of the Center and trying to open the door to the clinic, which T.R. had to lock out of fear of him, fear that caused her to bring pepper spray and a baseball bat to work "just in case." Chapman also left increasingly "threatening" voicemails, and on February 23, escalated that behavior by zip-tying meat claws and a hammer to his body before proceeding to the Center. And just as T.R. believed Chapman intended to scare her by doing so, a jury could reasonably find that Chapman used the meat claws to scare T.R. and facilitate his crime of stalking her.

Chapman asserts that "even the officer's body-camera footage shows that [Chapman] displayed the meat claws passively," and points to two photographs in evidence that, he claims, show him "*holding* the meat claws" and "the meat claws merely *resting* on his chest on some sort of chain." While

---

[5]     The Supreme Court went on to discuss with approval *Granado* "applying these principles," in what the Supreme Court described as our "thoughtful opinion." (*Ibid.*)

14

the photographs show what they show, the evidence from Fitch, Franco, and Captain O'Neal was that Chapman had zip-tied the claws to his wrists. Moreover, the entire footage from O'Neal's body cam was in evidence, showing precisely how Chapman displayed the meat claws. Finally, Chapman was carrying the "I loved you" poster when he returned to the Center, which supported that he was there to harass T.R., not some innocent reason.

Chapman asserts that his motivation in approaching the Center was to protest, citing what he told Franco. There is no evidence Franco believed him; indeed, he knew that Chapman's claim that the hammer was for "carpentry" was false. Certainly the jury was not required to accept Chapman's statement that he was there to protest, much like it was not required to accept his explanations that the ball-peen hammer was for a carpentry job and the meat claws because he liked to cook. (See *People v. Silva* (2001) 25 Cal.4th 345, 369 ["A rational trier of fact could disbelieve those portions of defendant's statements that were obviously self-serving"].) Chapman also contends that he approached the Center "in response" to O'Neal's phone call, despite that Chapman told O'Neal he had not received his message.

**Dangerous or Deadly Weapon**

Chapman's next argument is that there is insufficient evidence that the meat claws "constitute a dangerous weapon."

We begin by noting that this was not any part of Chapman's position below, as one looks in vain for any reference to such an argument in his counsel's closing argument. In any event, the argument has no merit.

Chapman's brief argument, slightly over a page, is that meat claws have a "utilitarian purpose," and that such an object which has practical uses

15

(such as a knife) is not a dangerous weapon as a matter of law.  Maybe not as a matter of law.  But that does not end the inquiry.

The law has long recognized there are two categories of dangerous or deadly weapons, the first of which includes instrumentalities that are "weapons in the strict sense of the word, such as guns, dirks, etc." (*People v. Reid* (1982) 133 Cal.App.3d 354, 365), and the second of which includes "those instrumentalities which are not weapons in the strict sense of the word, but which *may* be used as such, such as razors, pocket knives, hat pins, canes, hammers, hatchets, and other sharp or heavy objects." (*Ibid.*)  And as to them, if it appears that the item is "*capable* of being used in a dangerous or deadly manner, and it may be *fairly inferred* from the evidence that its possessor *intended* on a particular occasion to use it as a weapon should the circumstances require, its character as a dangerous or deadly weapon may be established, at least for purposes of that occasion." (*Ibid.*; *People v. Godwin* (1996) 50 Cal.App.4th 1562, 1575.)

In light of this, various instrumentalities that in most circumstances would be innocuous have been held to be dangerous weapons, including, for example, a pencil (*People v. Page* (2004) 123 Cal.App.4th 1466, 1472) and a screwdriver.  (*People v. Simons* (1996) 42 Cal.App.4th 1100, 1107.)  As Chapman's own brief acknowledges, quoting *People v. Montes* (1998) 74 Cal.App.4th 1050, 1054, "[o]bjects which are not inherently dangerous but which have been found to be a deadly weapon include 'a pillow. . . ; an automobile. . . ; a large rock. . . ; a razor blade. . . ; [and] a fingernail file.' "

Captain O'Neal described the meat claws as made from "hardened plastic and they're sharp.  Yeah, they'll scratch on stuff for sure."  And, the prosecutor argued, the meat claws were very sharp and could puncture skin and "certainly could cause great bodily injury to a person if they were applied

16

in that way." The meat claws themselves were admitted into evidence, so the jury could examine them, and see—and feel—just what harm they were capable of doing. They were a dangerous weapon.

### During the Commission of the Crime

Chapman's last argument is that there was insufficient evidence he displayed the meat claws "*during the commission of the crime*," that is, of stalking T.R. Setting forth the claimed evidence, however myopically, in a light favorable to him, Chapman's argument begins as follows: "This is not the typical stalking situation, where the stalker stakes out the victim's workplace, shows up, and harasses her for months. Here, the Center's staff were the ones who helped appellant find his apartment across the street from the Center. Appellant was also receiving services from the Center at the time he developed feelings for T.R., who was employed by the Center. T.R. never told appellant directly that his advances were unwelcome and it is unclear when the letter sent by T.R.'s director informing him of such was received. . . . T.R. never testified that appellant made any romantic advances towards her or that he behaved inappropriately on the call. While it is unclear when appellant made that call, appellant was seen not long after the call with the meat claws on February 23, 2024, in order to protest at the Center."

Missing from this description is that when Chapman came to the scene he was carrying the sign that stated, "I loved you," which, as the prosecutor argued, was a direct reference to—and a threat to—T.R., all while he had the meat claws zip-tied to his wrists and the hammer on his belt. As to this, Chapman dismisses it with the statement that "the prosecutor's argument that the poster somehow represented a threat to [T.R.] rests on pure speculation. What is clear is that appellant came back to the truck *in*

17

*response* to O'Neal's phone call." Chapman later asserts that it was Fitch who initiated the contact in the morning, and that Captain O'Neal "appeared to be the cause" why Chapman showed up in the afternoon. But Fitch saw Chapman that morning because he was parked directly in front of the Center, manifesting that he intended to be there. And when Chapman returned in the afternoon, he had not listened to O'Neal's message about moving his car.

A jury could reasonably find that Chapman used the meat claws "during the commission" of the crime.

## DISPOSITION

The judgment is affirmed.

_____

                                RICHMAN, J.

We concur.

_____

STEWART,  P. J.

_____

DESAUTELS, J.

(A171062N)